1 | Robert M. Saunders (CA Bar No. 226172)
PACHULSKI STANG ZIEHL & JONES LLP
2 | 10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90067
3 | Telephone: 310/277-6910
Facsimile:  310/201-0760
4 | E-mail:  rsaunders@pszjlaw.com

5 | -and-

6 | Ayala A. Hassell (TX SBN 01009800) (*Pro Hac Vice*)
PACHULSKI STANG ZIEHL & JONES LLP
7 | 440 Louisiana Street, Suite 900
Houston, TX 77002
8 | Telephone: (713) 691-9385
Email: ahassell@pszjlaw.com

9 |

10 | Counsel for Creditor, Hewlett-Packard Financial Services Company.

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO DIVISION**

| In re | Case No.:  1:21-bk-11544-MT |
|---|---|
| The Harman Press Inc., | Chapter 11 |
| Debtor. | **AMENDED WITNESS AND EXHIBIT LIST**<br><br>Date:     May 11, 2022<br>Time:     10:30 am<br>Place:    Courtroom 302<br>          21041 Burbank Blvd.<br>          Woodland Hills, CA  91367<br>Judge:    Hon. Maureen A. Tighe |

Hewlett-Packard Financial Services ("Movant") hereby submits the following *Amended Witness and Exhibit List* (the "Witness and Exhibit List"), with respect to the hearing scheduled on May 11, 2022 at 10:30 am (PT), with respect to the *NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY)* [Docket No. 114] in the above-captioned bankruptcy case (the "Case") before the Honorable Maureen Tighe, United States Bankruptcy Judge for the Central District of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

California, San Fernando Division, Courtroom 302, 21041 Burbank Boulevard, Woodland Hills,

California 91367.

### WITNESS LIST

Movant may call the following witnesses:

1.    Glenys Calzadilla with Hewlett-Packard Financial Services Company.

2.    Any witness listed, offered, or called by any other party.

3.    Any witness required for rebuttal or impeachment.

### EXHIBIT LIST

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 1 | Master Lease and Financing Agreement, number 104529 | | | | |
| 2 | Master Lease and Financing Agreement Schedule | | | | |
| 3 | Amendment to Master Lease and Financing Agreement Schedule | | | | |
| 4 | Filed UCC-1 financing statement re Purchase Money Security Interest in Equipment | | | | |
| 5 | Postpetition payment history that reflects no payments have been made by the Debtor since the petition date | | | | |
| 6 | Movant's email on or about April 26, 2022, from the Debtor agreeing to allow Movant to recover the Equipment from the Debtor's premises | | | | |
| 7 | *Notice of Motion and Motion for Relief from the Automatic Stay under 11 U.S.C. § 362 (with supporting declarations) (Personal Property)* filed in The Harman Press case (Central District of California Case No. 1:21-bk-11544-MT) [Docket No. 114] | | | | |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:343541.4 35882/003

| | | | | | |
|---|---|---|---|---|---|
| **8** | Any exhibits listed, designated, or offered by any other party. | | | | |
| **9** | Any exhibits necessary for rebuttal. | | | | |
| **10** | Any pleading or other document filed with the Court on the docket of the above-captioned chapter 11 case. | | | | |

Movant reserves the right to modify, amend or supplement this Witness and Exhibit List at any time.  Movant reserves the right to ask the Court to take judicial notice of pleadings, transcripts and/or documents filed in or in connection with these Cases, to offer rebuttal exhibits, and to supplement or amend this Witness and Exhibit List at any time prior to the May 11, 2022 Hearing. Designation of any exhibit above does not waive any objections Movant may have to any exhibit listed on any other party's exhibit list.

Dated:  May 10, 2022                    PACHULSKI STANG ZIEHL & JONES LLP


                                        */s/ Robert M. Saunders*
                                        Robert M. Saunders

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:343541.4 35882/003

# EXHIBIT 1



**HP Financial Services**

Invest

## MASTER LEASE AND FINANCING AGREEMENT

This Master Lease and Financing Agreement Number 104529 (together with Annex A and Exhibits A and B attached hereto and hereby made a part hereof, this "Master Agreement") is entered into by and between Hewlett-Packard Financial Services Company[1], a Delaware corporation ("Lessor"), and The Harman Press, a California Corporation ("Lessee"). Capitalized terms used in this Master Agreement without definition have the meanings specified in Annex A to this Master Agreement.

**1. MASTER AGREEMENT; SCHEDULES.** This Master Agreement sets forth the general terms and conditions upon which (a) Lessor shall lease to Lessee and Lessee shall lease from Lessor items of Hardware, Software or both (such Hardware and Software being collectively referred to as "Equipment") and (b) Lessor shall provide financing to Lessee for software program license fees, maintenance fees, fees for other services, and other costs and one-time charges ("Financed Items") Lessee desires to finance hereunder. If Lessor and Lessee agree to a lease of particular Equipment (a "Lease") and/or a financing of particular Financed Items (a "Financing"), each item of Equipment and/or Financed Item will be described on a schedule in the form of Exhibit A, which schedule will incorporate this Master Agreement by reference ("Schedule"). Each Schedule, when executed by Lessee and Lessor, will constitute a separate Lease and/or Financing. If specific terms of a Schedule conflict with the terms of this Master Agreement, the provisions of the Schedule will control.

**2. ACCEPTANCE; INITIAL TERM AND TERM.** (a) Acceptance. Lessee shall unconditionally and irrevocably accept all Equipment under a Lease and, if applicable, all related Financed Items subject to a Financing as soon as such Equipment is delivered and inspected by Lessee and found to be satisfactory. In the case of a Financing of Financed Items unrelated to any Equipment subject to a Lease, Lessee shall unconditionally and irrevocably accept such Financed Items as soon as it shall have become liable to pay for such Financed Items. In either case, Lessee will evidence such acceptance by executing and delivering to Lessor a properly completed Acceptance Certificate as soon as reasonably practicable. (b) Initial Term of Leases and Term of Financings. The Initial Term of each Lease and, if applicable, the Term of any related Financing stated in and evidenced by a Schedule executed pursuant to this Section 2 will begin on the Acceptance Date of the Equipment subject to that Lease and will continue for the period described in the applicable Schedule; the Term of each Financing stated in and evidenced by a Schedule executed pursuant to this Section 2 that is unrelated to any Lease will begin on the Acceptance Date for the related Financed Items and will continue for the period described in the applicable Schedule.

**3. RENT; LATE CHARGES.** As rent for the Equipment under any Lease and the Financed Items under any Financing (in either case, referred to in this Master Agreement and any Schedule as "Rent"), Lessee agrees to pay the amounts specified in the applicable Schedule on the due dates specified in the applicable Schedule. If any part of any Rent payment or other amount due under this Master Agreement is not paid within 10 days of its due date, Lessee agrees to pay Lessor: (a) in the first month, a late charge to compensate Lessor for collecting and processing the late amount, which late charge is stipulated and liquidated at the greater of $.05 per dollar of each delayed amount or $50; plus (b) a charge for every month after the first month in which the amount is late to compensate Lessor for the inability to reinvest the amount, which charge is stipulated and liquidated at 1-½% of the delayed amount per month (or the lesser rate that is the maximum rate allowable under applicable law).

**4. LEASES AND FINANCINGS NON-CANCELABLE; NET LEASES; WAIVER OF DEFENSES TO PAYMENT.** IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT EACH LEASE AND FINANCING HEREUNDER SHALL BE NON-CANCELABLE, AND THAT EACH LEASE HEREUNDER IS A NET LEASE. LESSEE AGREES THAT IT HAS AN ABSOLUTE AND UNCONDITIONAL OBLIGATION TO PAY ALL RENT AND OTHER AMOUNTS WHEN DUE. LESSEE IS NOT ENTITLED TO ABATE OR REDUCE RENT OR ANY OTHER AMOUNT DUE, OR TO SET OFF ANY CHARGE AGAINST ANY SUCH AMOUNT. LESSEE HEREBY WAIVES ANY RECOUPMENT, CROSS-CLAIM, COUNTERCLAIM OR ANY OTHER DEFENSE AT LAW OR IN EQUITY TO ANY RENT PAYMENT OR OTHER AMOUNT DUE WITH RESPECT TO ANY LEASE OR FINANCING, WHETHER ANY SUCH DEFENSE ARISES OUT OF THIS MASTER AGREEMENT, ANY SCHEDULE, ANY CLAIM BY LESSEE AGAINST LESSOR, LESSOR'S ASSIGNEES OR SUPPLIER, OR OTHERWISE.

**5. ASSIGNMENT OF PURCHASE DOCUMENTS.** Lessee assigns to Lessor all of Lessee's right, title and interest in and to (a) the Equipment described in each Schedule, and (b) the Purchase Documents relating to such Equipment. Such assignment of the Purchase Documents is an assignment of rights only; nothing in this Master Agreement shall be deemed to have relieved Lessee of any obligation or liability under any of the Purchase Documents, except that, as between Lessee and Lessor, Lessor shall pay for the Equipment within 30 days after Lessee's delivery to Lessor of a properly completed and executed Acceptance Certificate and all other documentation necessary to establish Lessee's acceptance of such Equipment under the related Lease. Lessee represents and warrants that it has reviewed and approved the Purchase Documents. In addition, if Lessor shall so request, Lessee shall deliver to Lessor a document acceptable to Lessor whereby Seller acknowledges and provides any required consent to such assignment. For the avoidance of doubt, Lessee covenants and agrees that it shall at all times during the Total Term of each Lease comply in all respects with the terms of any License Agreement relating to any Equipment leased thereunder. IT IS ALSO SPECIFICALLY UNDERSTOOD AND AGREED THAT NEITHER SUPPLIER NOR ANY SALESPERSON OF SUPPLIER IS AN AGENT OF LESSOR, NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER ANY TERMS OF THIS MASTER AGREEMENT OR ANY SCHEDULE.

**6. ASSIGNMENT OF SUPPLIER WARRANTIES.** To the extent permitted, Lessor hereby assigns to Lessee, for the Total Term of any Lease, all Equipment warranties, indemnities, and representations provided in the applicable Purchase Documents. Lessee shall have the right to take any action it deems appropriate to enforce such warranties, indemnities and representations provided such enforcement is pursued in Lessee's name and at its expense. Any recovery resulting from any such enforcement efforts will be divided between Lessor and Lessee as their interests may appear.

**7. EQUIPMENT RETURN REQUIREMENTS.** Not later than 5 days after the last day of the Total Term of each Lease (and any other time Lessee is required to return Equipment to Lessor under the terms of this Master Agreement or any Schedule), for all Equipment to be returned to Lessor, Lessee shall (a) remove any Lessee labels, tags or other identifying marks on the Equipment and wipe clean or permanently delete all data contained on the Equipment, including without limitation, any data contained on internal or external drives, discs, or accompanying media, (b) pack the Equipment in accordance with the manufacturer's guidelines, and (c) deliver such Equipment to Lessor at any destination within the continental United States designated by Lessor. In the case of any item of Software to be returned to Lessor, Lessee shall also deliver to Lessor the original certificate of authenticity issued by the licensor of such Software, if any, the end user license agreement, any CD-ROM, diskettes or other media relating to such Software and any other materials originally delivered to Lessee with such Software. All dismantling, packaging, transportation, in-transit insurance and shipping charges shall be borne by Lessee. All Equipment shall be returned to

---

[1] Authorized to do business in the name of Hewlett-Packard Financial Services Company Inc. in the States of Alabama and New York.

Lessor in the same condition and working order as when delivered to Lessee, reasonable wear and tear excepted, and, except in the case of PC Equipment and Software, shall qualify for maintenance service by the Supplier at its then standard rates for Equipment of that age, if available. Lessee shall be responsible for, and shall reimburse Lessor promptly on demand for, the cost of returning the Equipment to good working condition or, in the case of Equipment other than PC Equipment and Software, qualifying the Equipment for the Supplier's maintenance service, if available. The return of the Equipment shall constitute a full release by Lessee of any leasehold rights or possessory interest in the Equipment.

8. **EQUIPMENT USE; MAINTENANCE AND ADDITIONS.** Lessee shall, at its own expense, at all times during the applicable Total Term (a) operate and maintain the Equipment in good working order, repair and condition, and in accordance with the manufacturer's specifications and recommendations, (b) except in the case of PC Equipment and Software, maintain and enforce a maintenance agreement to service and maintain the Equipment, upon terms and with a provider reasonably acceptable to Lessor, such that the Equipment shall qualify for Maintenance Service at the time the Equipment is returned to Lessor, and (c) make all alterations or additions to the Equipment required by any applicable law, regulation or order. Lessee shall make no alterations or additions to the Equipment, except those that will not void any warranty made by the Supplier of the Equipment, result in the creation of any security interest, lien or encumbrance on the Equipment or impair the value or use of the Equipment either at the time made or at the end of the Total Term of the applicable Lease, and that are readily removable without damage to the Equipment ("Optional Additions"). All additions to the Equipment or repairs made to the Equipment, except Optional Additions, become a part thereof and Lessor's property at the time made. Optional Additions that have not been removed prior to the return of the Equipment shall become Lessor's property upon such return. On at least 24 hours prior notice to Lessee, Lessor and Lessor's agents shall have the right, during Lessee's normal business hours, to enter the premises where the Equipment is located for the purpose of inspecting the Equipment.

9. **EQUIPMENT OWNERSHIP; LIENS; LOCATION.** As between Lessor and Lessee, Lessor is the sole owner of the Equipment and has sole title thereto. Lessee covenants that it will not pledge or encumber the Equipment or Lessor's interest in the Equipment in any manner whatsoever nor create or permit to exist any levy, lien or encumbrance thereof or thereon except those created by or through Lessor. The Equipment shall remain Lessor's personal property whether or not affixed to realty and shall not become a fixture or be made to become a part of any real property on which it is placed without Lessor's prior written consent. If Lessee has been provided tags or identifying labels, Lessee will at Lessee's expense affix and maintain the same in a prominent position on each item of Equipment to indicate Lessor's ownership. Lessee may relocate any Equipment from the Equipment Location specified in the applicable Schedule to another of its business locations within the United States upon prior written notice to Lessor specifying the new Equipment Location, provided Lessee remains in possession and control of the Equipment. Lessee shall not locate or relocate any Equipment such that any third party comes into possession or control thereof without Lessor's prior written consent; provided, however, that Lessor shall not unreasonably withhold its consent to the location or relocation of Equipment to a third party co-location or hosting facility if such third party shall have executed and delivered to Lessor a waiver agreement in form and substance acceptable to Lessor pursuant to which, among other things, such third party shall have waived any rights in the Equipment and agreed to surrender the Equipment to Lessor in the event of a Lease Default under this Master Agreement.

10. **RISK OF LOSS AND INSURANCE.** Lessee assumes any and all risk of loss or damage to the Equipment until such Equipment is returned to and received by Lessor in accordance with the terms and conditions of this Master Agreement. Lessee agrees to keep the Equipment insured at Lessee's expense against all risks of loss from any cause whatsoever, including without limitation, loss by fire (including extended coverage), theft and damage, and such insurance shall cover not less than the Stipulated Loss Value of the Equipment. Lessee also agrees that it shall carry commercial general liability insurance in an amount not less than $2,000,000 total liability per occurrence. Lessee shall cause Lessor and its affiliates, and its and their successors and assigns, to be named loss payees and additional insureds, as applicable, under such insurance policies. Each policy shall provide that the insurance cannot be canceled without at least 30 days prior written notice to Lessor, and no policy shall contain a deductible in excess of $25,000. Lessee shall provide to Lessor (a) on or prior to the Acceptance Date for each Lease, and from time to time thereafter, certificates of insurance evidencing such insurance coverage throughout the Total Term of each Lease, and (b) upon Lessor's request, copies of the insurance policies. If Lessee fails to provide Lessor with such evidence, then Lessor will have the right, but not the obligation, to purchase such insurance protecting Lessor at Lessee's expense. Lessee's expense shall include the full premium paid for such insurance and any customary charges, costs or fees of Lessor. Lessee agrees to pay such amounts in substantially equal installments allocated to each Rent payment (plus interest on such amounts at the rate of 1-1/2% per month or such lesser rate as is the maximum rate allowable under applicable law).

11. **CASUALTY LOSS.** Lessee shall notify Lessor of any Casualty Loss or repairable damage to any Equipment not later than 30 days following the date of any such occurrence. In the event any Casualty Loss shall occur, on the next Rent payment date Lessee shall pay Lessor the Stipulated Loss Value of the Equipment suffering the Casualty Loss. Upon Lessor's receipt of such payment of Stipulated Loss Value in full: (a) Lessor shall transfer to Lessee all of Lessor's interest in the Equipment suffering the Casualty Loss "AS IS, WHERE IS," without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor, (b) the applicable Lease shall terminate as it relates to such Equipment, and (c) except as provided in Section 26(m), Lessee shall be relieved of all obligations under the applicable Lease as it relates to such Equipment. In the event of any repairable damage to any Equipment, the Lease shall continue with respect to such Equipment without any abatement of Rent and Lessee shall at its expense cause such Equipment to be repaired to the condition it is required to be maintained in pursuant to Section 8 not later than 30 days from the date of the occurrence.

12. **TAXES.** Lessee shall report and pay all Taxes now or hereafter imposed or assessed by governmental body, agency or taxing authority upon the purchase, ownership, delivery, installation, leasing, rental, use or sale of the Equipment, the Rent or other charges payable hereunder, or otherwise upon or in connection with any Lease or Financing, whether assessed on Lessor or Lessee, other than any such Taxes required by law to be reported and paid by Lessee. Lessee shall within 30 days of invoice reimburse Lessor for all such Taxes paid by Lessor, together with any penalties or interest in connection therewith attributable to Lessee's acts or failure to act, excluding (a) Taxes on or measured by the overall gross or net income or items of tax preference of Lessor, (b) as to any Lease or the related Equipment, Taxes attributable to the period after the return of such Equipment to Lessor, and (c) Taxes imposed as a result of a sale or other transfer by Lessor of any portion of its interest in any Lease or Financing or in any Equipment, except for a sale or other transfer to Lessee or a sale or other transfer occurring after and during the continuance of any Lessee Default.

13. **GENERAL INDEMNITY.** Lessee shall indemnify, defend and hold harmless Lessor, its employees, officers, directors, agents and assignees from and against any and all Claims arising directly or indirectly out of or in connection with any matter involving this Master Agreement, the Equipment, the Financed Items or any Lease and/or Financing.

14. **TAX BENEFIT INDEMNITY.** Lessor and Lessee agree that Lessor is entitled to certain federal, state and local tax benefits available to an owner of Equipment (collectively, "Tax Benefits"), including without limitation, accelerated cost recovery system deductions for 5-year property and deductions for interest incurred by Lessor to finance the purchase of Equipment available under the Code. Lessee represents, warrants and covenants to Lessor that (a) Lessee is not a tax-exempt entity (as defined in Section 168(h) of the Code); (b) all Equipment will be used solely within the United States; and (c) Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for federal, state, and local tax purposes. If, due to any act or omission of Lessee or

(Rev. 9.05)

2

any party acting through Lessee, or the breach or inaccuracy of any representation, warranty or covenant of Lessee contained in any Fundamental Agreement, Lessor reasonably determines that it cannot claim, is not allowed to claim, loses or must recapture any or all of the Tax Benefits otherwise available with respect to the Equipment subject to any Lease (a "Tax Loss"), then Lessee shall, promptly upon demand, pay to Lessor an amount sufficient to provide Lessor the same after-tax rate of return and aggregate after-tax cash flow through the end of the Then Applicable Term of such Lease that Lessor would have realized but for such Tax Loss.

15. COVENANT OF QUIET ENJOYMENT. So long as no Lessee Default exists, and no event shall have occurred and be continuing which, with the giving of notice or the passage of time or both, would constitute a Lessee Default neither Lessor nor any party acting or claiming through Lessor, by assignment or otherwise, will disturb Lessee's quiet enjoyment of the Equipment during the Total Term of the related Lease.

16. DISCLAIMERS AND LESSEE WAIVERS.   LESSEE LEASES THE EQUIPMENT FROM LESSOR "AS IS, WHERE IS".   IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT (A) EXCEPT AS EXPRESSLY SET FORTH IN SECTION 15, LESSOR MAKES ABSOLUTELY NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY, OPERATION, OR CONDITION OF ANY EQUIPMENT OR FINANCED ITEMS (OR ANY PART THEREOF), THE MERCHANTABILITY OR FITNESS OF EQUIPMENT OR FINANCED ITEMS FOR A PARTICULAR PURPOSE, OR ISSUES REGARDING PATENT INFRINGEMENT, TITLE AND THE LIKE: (B) LESSOR SHALL NOT BE DEEMED TO HAVE MADE, BE BOUND BY OR LIABLE FOR,   ANY REPRESENTATION, WARRANTY OR PROMISE MADE BY THE SUPPLIER OF ANY EQUIPMENT OR FINANCED ITEMS (EVEN IF LESSOR IS AFFILIATED WITH SUCH SUPPLIER); (C) LESSOR SHALL NOT BE LIABLE FOR ANY FAILURE OF ANY EQUIPMENT OR FINANCED ITEMS OR ANY DELAY IN THE DELIVERY OR INSTALLATION THEREOF; (D) LESSEE HAS SELECTED ALL EQUIPMENT AND FINANCED ITEMS WITHOUT LESSOR'S ASSISTANCE; AND (E) LESSOR IS NOT A MANUFACTURER OF ANY EQUIPMENT,  IT IS FURTHER AGREED THAT LESSOR SHALL HAVE NO LIABILITY TO LESSEE OR ANY THIRD PARTIES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS MASTER AGREEMENT OR ANY SCHEDULE OR CONCERNING ANY EQUIPMENT OR FINANCED ITEMS, OR FOR ANY DAMAGES BASED ON STRICT OR ABSOLUTE TORT LIABILITY OR LESSOR'S NEGLIGENCE; PROVIDED, HOWEVER, THAT NOTHING IN THIS MASTER AGREEMENT SHALL DEPRIVE LESSEE OF ANY RIGHTS IT MAY HAVE AGAINST ANY PERSON OTHER THAN LESSOR. LESSOR AND LESSEE AGREE THAT THE LEASES AND THE FINANCINGS SHALL BE GOVERNED BY THE EXPRESS PROVISIONS OF THIS MASTER AGREEMENT AND THE OTHER FUNDAMENTAL AGREEMENTS AND NOT BY THE CONFLICTING PROVISIONS OF ANY OTHERWISE APPLICABLE LAW. ACCORDINGLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES THOSE RIGHTS AND REMEDIES AGAINST A LESSOR CONFERRED UPON A LESSEE BY ARTICLE 2A OF THE UCC AND THOSE RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE, IN EITHER CASE THAT ARE INCONSISTENT WITH OR THAT WOULD LIMIT OR MODIFY LESSOR'S RIGHTS SET FORTH IN THIS MASTER AGREEMENT.

17. LESSEE WARRANTIES. Lessee represents, warrants and covenants to Lessor that as of the date of this Master Agreement and for so long as this Master Agreement shall remain in effect: (a) ALL EQUIPMENT WILL BE USED FOR BUSINESS PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES: (b) Lessee is duly organized, validly existing and in good standing under applicable law; (c) Lessee has the power, and authority to enter into each of the Fundamental Agreements; (d) all Fundamental Agreements are enforceable against Lessee in accordance with their terms and do not violate or create a default under any instrument or agreement binding on Lessee; (e) as of the date of its execution of this Master Agreement and as of the Acceptance Date of any Equipment or Financed Items, there are no pending or threatened actions or proceedings before any court or administrative agency that could reasonably be expected to have a material adverse effect on Lessee or any Fundamental Agreement, unless such actions are disclosed to Lessor and consented to in writing by Lessor; (f) Lessee shall comply  with the requirements of all applicable laws and regulations the violation of which could have an  adverse effect upon the Equipment, Lessor's rights and remedies under any Fundamental Agreement or Lessee's performance of its obligations under any Fundamental Agreement; (g) each Fundamental Agreement shall be effective against all creditors of Lessee under applicable law, including fraudulent conveyance and bulk transfer laws, and shall raise no presumption of fraud; (h) all financial statements and other related information furnished by Lessee shall be prepared in accordance with generally accepted accounting principles and shall fairly present Lessee's financial position as of the dates given on such statements; (i) Lessee's name set forth in the signature block below is Lessee's full and accurate legal name; (j) Lessee is a Corporation organized under the laws of California; (k) Lessee's "location" (within the meaning of UCC Section 9-307) is 1227 North Highland Ave, Los Angeles, CA 90038; (l) Lessee's organizational number assigned to it by its jurisdiction of organization is C0453628; (m) Lessee's federal tax identification number is 95-2280466 ; (n) Lessee and all Lessee Affiliates do not export, re-export, or transfer any Equipment, Software, System Software or source code or any direct product thereof to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments; (o) Lessee and all Lessee Affiliates do not use any Equipment, Software or System Software or technology, technical data, or technical assistance related thereto or the products thereof in the design, development. or production of nuclear, missile, chemical, or biological weapons or transfer the same to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments; and (p) Lessee and all Lessee Affiliates are not entities designated by the United States government or any other applicable government with which transacting business without the prior consent of such government is prohibited.  Lessee agrees to provide Lessor advance written notice of any change in any of the representations and covenants set forth in clauses (i) through (m) of this Section 17.

18. DEFAULT. Any of the following shall constitute a default by Lessee (a "Lessee Default") under this Master Agreement and all Leases and Financings: (a) Lessee fails to pay any Rent payment or any other amount payable to Lessor under this Master Agreement or any Schedule within 10 days after its due date; or (b) Lessee defaults on or breaches any of the other terms and conditions of any Material Agreement, and fails to cure such breach within 10 days after written notice thereof from Lessor; or (c) any representation or warranty made by Lessee in any Material Agreement proves to be incorrect in any material respect when made or reaffirmed; or (d) any change occurs in relation to Lessee's or Guarantor's business, management, ownership or financial condition that would have a material adverse effect on Lessee's ability to perform its obligations under this Master Agreement or any Schedule or Guarantor's ability to perform its obligations under its guaranty; or (e) Lessee or Guarantor dissolves or otherwise terminates its existence, ceases to do business or becomes insolvent or fails generally to pay its debts as they become due; or (f) any Equipment is levied against, seized or attached; or (g) Lessee or Guarantor makes an assignment for the benefit of creditors; or (h) a proceeding under any bankruptcy, reorganization. arrangement of debt, insolvency or receivership law is filed by or against Lessee or Guarantor (and, if such proceeding is involuntary, it is not dismissed within 60 days after the filing thereof) or Lessee or Guarantor takes any action to authorize any of the foregoing matters; or (i) any letter of credit or guaranty issued in support of a Lease or Financing is revoked, breached, cancelled or terminated (unless consented to in advance in writing by Lessor); or (j) any Guarantor fails to fulfill its obligations in favor of Lessor pursuant to its guaranty.

(Rev. 9.05)

3

**19. REMEDIES.** If a Lessee Default occurs, Lessor may, in its sole discretion, exercise one or more of the following remedies: (a) declare all amounts due and to become due under any or all Leases and Financings to be immediately due and payable; or (b) terminate this Master Agreement or any Lease or Financing; or (c) take possession of, or render unusable, any Equipment wherever the Equipment may be located, without demand or notice and without any court order or other process of law in accordance with Lessee's reasonable security procedures, and no such action shall constitute a termination of any Lease; or (d) require Lessee to deliver the Equipment to a location specified by Lessor; or (e) declare the Stipulated Loss Value for any or all Equipment to be due and payable as liquidated damages for loss of a bargain and not as a penalty and in lieu of any further Rent payments under the applicable Lease or Leases; or (f) proceed by court action to enforce performance by Lessee of any Lease or Financing and/or to recover all damages and expenses incurred by Lessor by reason of any Lessee Default; or (g) terminate any other agreement that Lessee may have with Lessee; or (h) exercise any other right or remedy available to Lessor at law or in equity. Also, Lessee shall pay Lessor all costs and expenses that Lessor may incur to maintain, safeguard or preserve the Equipment, and other expenses incurred by Lessor in enforcing any of the terms, conditions or provisions of this Master Agreement (including reasonable legal fees and collection agency costs). Upon repossession or surrender of any Equipment or Collateral, Lessor may lease, sell or otherwise dispose of the Equipment and/or Collateral in a commercially reasonable manner, with or without notice and at public or private sale, and apply the net proceeds thereof to the amounts owed to Lessor hereunder, but only after deducting (1) in the case of a sale, the estimated Fair Market Value of the Equipment sold as of the scheduled expiration of the Then Applicable Term of the related Lease, (2) in the case of a lease, the rent due for any period beyond the scheduled expiration of the Then Applicable Term of the related Lease, and (3) in either case, all expenses (including reasonable legal fees and costs) incurred by Lessor in connection therewith, or propose to retain any or all of the Equipment and/or Collateral in full or partial satisfaction, as the case may be, of amounts owed to Lessor hereunder; provided, however, that Lessee shall remain liable to Lessor for any deficiency that remains after any sale, lease or retention by Lessor of such Equipment. Any proceeds of any sale or lease of such Equipment in excess of the amounts owed to Lessor hereunder shall be retained by Lessor. Lessee agrees that with respect to any notice of a sale required by law to be given, 10 days' notice shall constitute reasonable notice. Upon payment of all past due Rent and the Stipulated Loss Value as provided in clause (e) above, together with interest at the rate of 1-1/2% per month (or such lesser rate as is the maximum rate allowable under applicable law) from the date declared due until paid, Lessor will transfer to Lessee all of Lessor's interest in the Equipment for which such Rent and Stipulated Loss Value has been paid, which transfer shall be on an "AS IS, WHERE IS" basis, without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. With respect to any exercise by Lessor of its right to recover and/or dispose of any Equipment or other Collateral securing Lessee's obligations under any Schedule, Lessee acknowledges and agrees as follows: (i) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the Equipment or any other Collateral for disposition, (ii) Lessor may comply with any applicable state or Federal law requirements in connection with any disposition of the Equipment or other Collateral, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any such disposition, and (iii) Lessor may convey the Equipment and any other Collateral on an "AS IS, WHERE IS" basis, and without limiting the generality of the foregoing, may specifically exclude or disclaim any and all warranties, including any warranty of title or the like with respect to the disposition of the Equipment or other Collateral, and no such conveyance or such exclusion or such disclaimer of any warranty shall be deemed to have adversely affected the commercial reasonableness of any such disposition. These remedies are cumulative of every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently or separately from time to time.

**20. PERFORMANCE OF LESSEE'S OBLIGATIONS.** If Lessee fails to perform any of its obligations hereunder, Lessor may perform any act or make any payment that Lessor deems reasonably necessary for the preservation of Lessor's interests therein; provided, however, that the performance of any act or payment by Lessor shall not be deemed a waiver or release of Lessee from the obligation at issue. All sums so paid by Lessor, together with expenses (including legal fees and costs) incurred by Lessor in connection therewith, shall be paid to Lessor by Lessee immediately upon demand.

**21. TRUE LEASE; SECURITY INTEREST; MAXIMUM RATE.** Each Lease is intended to be a "Finance Lease" as defined in Article 2A of the UCC, and Lessee hereby authorizes Lessor to file a financing statement to give public notice of Lessor's ownership of the Equipment. The parties' intent that each Lease be a "Finance Lease" within the meaning of Article 2A of the UCC shall have no effect on the characterization of any Lease for accounting purposes, which characterization shall be made by each party independently on the basis of generally accepted accounting principles. Lessee, by its execution of each Schedule, acknowledges that Lessor has informed it that (a) the identity of Seller is set forth in the applicable Schedule, (b) Lessee is entitled under Article 2A of the UCC to the promises and warranties, including those of any third party, provided to Lessor in connection with, or as a part of, the applicable Purchase Documents, and (c) Lessee may communicate with Seller and receive an accurate and complete statement of the promises and warranties, including any disclaimers and limitations of them or of remedies. If (1) notwithstanding the express intention of Lessor and Lessee to enter into a true lease, any Lease is ever deemed by a court of competent jurisdiction to be a lease intended for security, or (2) Lessor and Lessee enter into a Lease with the intention that it be treated as a lease intended as security by so providing in the applicable Schedule, or (3) Lessor and Lessee enter into a Financing, then to secure payment and performance of Lessee's obligations under this Master Agreement and all Leases and Financings, Lessee hereby grants Lessor a purchase money security interest in the Collateral. In any such event, notwithstanding any provisions contained in this Master Agreement or in any Schedule, neither Lessor nor any Assignee shall be entitled to receive, collect or apply as interest any amount in excess of the maximum rate or amount permitted by applicable law. In the event Lessor or any Assignee ever receives, collects or applies as interest any amount in excess of the maximum amount permitted by applicable law, such excess amount shall be applied to the unpaid principal balance and any remaining excess shall be refunded to Lessee. In determining whether the interest paid or payable under any specific contingency exceeds the maximum rate or amount permitted by applicable law, Lessor and Lessee shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as an expense or fee rather than as interest, exclude voluntary prepayments and the effect thereof, and spread the total amount of interest over the entire term of this Master Agreement and all Leases and Financings.

**22. ASSIGNMENT.** Lessor shall have the unqualified right to sell, assign, grant a security interest in or otherwise convey any part of its interest in this Master Agreement, any Lease or Financing or any Equipment, in whole or in part, without prior notice to or the consent of Lessee. If any Lease or Financing is sold, assigned, or otherwise conveyed, Lessee agrees that (a) Assignee shall (1) have the same rights, powers and privileges that Lessor has under the applicable Lease or Financing, and (2) have the right to receive from Lessee all amounts due under the applicable Lease or Financing, in either case, to the extent assigned; and (b) it may not require Assignee to perform any obligations of Lessor, other than those that are expressly assumed in writing by Assignee. Lessee agrees to execute such acknowledgements thereto as may be reasonably requested by Lessor or Assignee. Lessee further agrees that in any action brought by such Assignee against Lessee to enforce Lessor's rights hereunder, Lessee will not assert against such Assignee any set-off, defense or counterclaim that Lessee may have against Lessor, Assignee, or any other person. Unless otherwise specified by Lessor and Assignee, Lessee shall continue to pay all amounts due under the applicable Lease or Financing to Lessor; provided, however, that upon notification from Lessor and Assignee, Lessee covenants to pay all amounts due under the applicable Lease or Financing to Assignee when due and as directed in such notice. Lessee further agrees that any Assignee may further sell, assign, grant a security interest in or otherwise convey its rights and interests under the applicable Lease or Financing with the same force and effect as the assignment described herein. Lessee may not assign, transfer, sell, sublease, pledge or otherwise dispose of this Master Agreement, any Lease or Financing, any Equipment or any interest therein.

(Rev. 9.05)

4

23. **TERM OF MASTER AGREEMENT.** This Master Agreement shall commence and be effective upon the execution hereof by both parties and shall continue in effect until terminated by either party by 30 days' prior written notice to the other. However, no termination of this Master Agreement pursuant to the preceding sentence shall be effective with respect to any Lease or Financing that commenced prior to such termination until the expiration or termination of such Lease or Financing and the satisfaction by Lessee of all of its obligations hereunder with respect thereto.

24. **WAIVER OF JURY TRIAL.** LESSEE AND LESSOR HEREBY EXPRESSLY WAIVE ANY RIGHT TO DEMAND A JURY TRIAL WITH RESPECT TO ANY ACTION OR PROCEEDING INSTITUTED BY LESSOR OR LESSEE IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY FUNDAMENTAL AGREEMENT.

25. **NOTICES.** All notices, requests, demands, waivers and other communications required or permitted to be given under this Master Agreement or any other Fundamental Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or mailed via certified mail or a nationally recognized overnight courier service, or sent by confirmed facsimile transmission, addressed as follows (or such other address or fax number as either party shall so notify the other):

| If to Lessor: | If to Lessee: |
|---|---|
| Hewlett-Packard Financial Services Company | The Herman Press |
| 420 Mountain Avenue - P.O. Box 6 | 1222 North Highland Ave |
| Murray Hill, New Jersey 07974-0006 | Los Angeles, CA 90038 |
| Attn: Director of Operations, North America | Attn: Philip Goldner |
| Fax: (908) 898-4109 | Fax: 323-461-7000 |

26. **MISCELLANEOUS.**

(a) **Governing Law.** THIS MASTER AGREEMENT AND EACH LEASE AND FINANCING SHALL BE GOVERNED BY THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAW PROVISIONS) OF THE STATE OF NEW JERSEY.

(b) **Consent to Jurisdiction.** Lessor and Lessee consent to the jurisdiction of any local, state or Federal court located within the State of New Jersey and waive any objection relating to improper venue or forum non-conveniens to the conduct of any proceeding in any such court.

(c) **Credit Review.** Lessee consents to a credit review by Lessor for each Lease and Financing.

(d) **Further Assurances.** Lessee agrees to promptly execute and deliver to Lessor such further documents and take such further action as Lessor may require in order to more effectively carry out the intent and purpose of this Master Agreement and any Schedule. Without limiting the generality of the foregoing, Lessee agrees (a) to furnish to Lessor from time to time, its certified financial statements, officer's certificates and appropriate resolutions, opinions of counsel and such other information and documents as Lessor may reasonably request, and (b) to execute and timely deliver to Lessor any financing statements or other documents that Lessor deems necessary under applicable law to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment; provided, however, that Lessee authorizes Lessor to file any such financing statement or other document without Lessee's authentication to the extent permitted by applicable law. Lessee hereby appoints Lessor and any agent of Lessor as Lessee's attorney-in-fact, with full power of substitution, for the sole purpose of executing on behalf of Lessee such UCC financing statements as Lessor deems necessary to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment. Lessee acknowledges and agrees that such appointment is coupled with an interest and is irrevocable until the expiration or termination of all Leases and Financings and the satisfaction by Lessee of all of its obligations hereunder. It is also agreed that Lessor or Lessor's agent may file as a financing statement, any lease document (or copy thereof, where permitted by law) that Lessor deems appropriate to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment. Upon demand, Lessee will promptly reimburse Lessor for any filing or recordation fees or expenses (including legal fees and costs) incurred by Lessor in perfecting or protecting its interests in any Collateral or the Equipment.

(e) **Captions and References.** The captions contained in this Master Agreement and any Schedule are for convenience only and shall not affect the interpretation of this Master Agreement. All references in this Master Agreement to Sections, Annexes and Exhibits refer to Sections hereof, Annexes hereof and Exhibits hereto unless otherwise indicated.

(f) **Entire Agreement; Amendments.** This Master Agreement and all other Fundamental Agreements executed by both Lessor and Lessee constitute the entire agreement between Lessor and Lessee relating to the leasing of the Equipment and the financing of Financed Items, and supersede all prior agreements relating thereto, whether written or oral, and may not be amended or modified except in a writing signed by the parties hereto.

(g) **No Waiver.** Any failure of Lessor to require strict performance by Lessee, or any written waiver by Lessor of any provision hereof, shall not constitute consent or waiver of any other breach of the same or any other provision hereof.

(h) **Lessor Affiliates.** Lessee understands and agrees that Hewlett-Packard Financial Services Company or any affiliate or subsidiary thereof may, as lessor, execute Schedules under this Master Agreement, in which event the terms and conditions of the applicable Schedule and this Master Agreement, as it relates to the lessor under such Schedule, shall be binding upon and shall inure to the benefit of such entity executing such Schedule as lessor, as well as any successors or assigns of such entity.

(i) **Lessee Affiliates.** A Lessee Affiliate may enter into a Lease or Financing under and subject to the terms and conditions of this Master Agreement by executing a Schedule incorporating this Master Agreement by reference, in which case such Lessee Affiliate shall be deemed, for purposes of such Lease or Financing, to be the "Lessee" under this Master Agreement. The undersigned Lessee hereby unconditionally guarantees to Lessor the full and prompt payment, observance and performance when due of all obligations of all Lessee Affiliates (collectively, "Guaranteed Obligations") under all such Leases and Financings. The foregoing guarantee is absolute, continuing, unlimited and independent and shall not be affected, diminished or released for any reason whatsoever. The undersigned Lessee waives diligence, presentment, demand for payment, protest or notice of any Lessee Default or nonperformance by any Lessee Affiliate, all affirmative defenses, offsets and counterclaims against Lessor, any right to the benefit of any security or statute of limitations, and any requirement that Lessor proceed first against a Lessee Affiliate or any collateral security. Until the Guaranteed Obligations shall have been paid in full, Lessee shall have no right of subrogation.

(j) **Invalidity.** If any provision of this Master Agreement or any Schedule shall be prohibited by or invalid under law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Master Agreement or such Schedule.

(k) **Counterparts.** This Master Agreement may be executed in counterparts, which collectively shall constitute one document.

(l) **Lessor Reliance.** In connection with its execution of this Master Agreement, Lessee shall deliver to Lessor an officer's certificate (or partner's or member's certificate as appropriate) in form and substance acceptable to Lessor, executed by a duly authorized officer (or partner or member) of Lessee and certifying as to, among other things, Lessee's authority to enter into this Master Agreement and Leases and Financings hereunder and the authority of Lessee's officers or

(Rev. 9.05)

5

representatives specified therein to execute this Master Agreement and all other Fundamental Agreements, Lessor may act in reliance upon any instruction, instrument or signature reasonably believed by Lessor in good faith to be genuine. Lessor may assume that any employee of Lessee who executes any document or gives any written notice, request or instruction has the authority to do so.

(m) Survival. All representations, warranties and covenants made by Lessee hereunder shall survive the termination of this Master Agreement and shall remain in full force and effect. All of Lessor's rights, privileges and indemnities under this Master Agreement or any Lease or Financing, to the extent they are fairly attributable to events or conditions occurring or existing on or prior to the expiration or termination of such Lease or Financing, shall survive such expiration or termination and be enforceable by Lessor and Lessor's successors and assigns.

27. Lessee acknowledges that neither this Master Agreement nor any other Fundamental Agreement may be amended or modified except by a writing signed by Lessor and Lessee. Lessee Initials: _____PG_____.

IN WITNESS WHEREOF, LESSEE AND LESSOR HAVE EXECUTED THIS MASTER AGREEMENT ON THE DATES SPECIFIED BELOW.

LESSEE:
THE HARMAN PRESS
By: _____
Name: PHILLIP GOLDNER
Title: PRESIDENT
Date: 9/5/08

LESSOR:
HEWLETT-PACKARD FINANCIAL SERVICES
COMPANY[2]
By: _____
Name: Ida Owino-Edelmann
Title: CDMO
Date: 10-17-08

---

[1] Authorized to do business in the name of Hewlett-Packard Financial Services Company Inc. in the States of Alabama and New York.



**MASTER LEASE AND FINANCING AGREEMENT ANNEX A**

Capitalized terms used in the Master Lease and Financing Agreement Number 104529 by and between Hewlett-Packard Financial Services Company and The Harman Press ("Master Agreement") without definition shall have the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Master Agreement.

"Acceptance Certificate" means an acceptance certificate in substantially the form of Exhibit B executed by Lessee and delivered to Lessor in accordance with Section 2 of the Master Agreement.

"Acceptance Date" means the effective date of Lessee's acceptance of the Equipment or Financed Item(s) as referenced on the Acceptance Certificate for such Equipment and/or Financed Item(s).

"Assignee" means any assignee of all or any portion of Lessor's interest in the Master Agreement, any Schedule or any Equipment, whether such assignee received the assignment of such interest from Lessor or a previous assignee of such interest.

"Casualty Loss" means, with respect to any Equipment, the condemnation, taking, loss, destruction, theft or damage beyond repair of such Equipment.

"Casualty Value" means, as to any Equipment, an amount determined as of the date of the Casualty Loss or Lessee Default in question pursuant to a "Table of Casualty Values" attached to the applicable Schedule or, if no "Table of Casualty Values" is attached to the applicable Schedule, an amount equal to the sum of (a) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 5% per annum, compounded monthly) of all Rent payments payable after such date through the scheduled date of expiration of the Then Applicable Term, plus (b) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 5% per annum, compounded monthly, from the scheduled date of expiration of the Then Applicable Term) of an amount determined by multiplying the applicable casualty percentage specified below by the Total Cost of such Equipment. The applicable casualty percentage shall be 50% for Equipment having an Initial Term of less than 24 months; 40% for Equipment having an Initial Term of 24 months or greater, but less than 36 months; 30% for Equipment having an Initial Term of 36 months or greater, but less than 48 months; and 25% for Equipment having an Initial Term of 48 months or greater.

"Claims" means all claims, actions, suits, proceedings, costs, expenses (including, without limitation, court costs, witness fees and attorneys' fees), damages, obligations, judgments, orders, penalties, fines, injuries, liabilities and losses, including, without limitation, actions based on Lessor's strict liability in tort.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means, with respect to any Lease or Financing, all Equipment and Financed Items and any and all attachments, accessories, additions, general intangibles, substitutions, products, replacements, rentals, and any right, title or interest in any software used to operate or otherwise installed in any of the foregoing, and proceeds (including, without limitation, insurance proceeds) thereof, as well as any and all other equipment financed pursuant to this Master Agreement or any other agreement between Lessor and Lessee and all other collateral furnished by Lessee to secure Lessee's obligations under any Schedule.

"Daily Rent" means, as to any Lease or Financing, an amount equal to the per diem Rent payable under the applicable Schedule.

"End-of-Term Notice" has the meaning specified in the applicable Schedule.

"Equipment" has the meaning specified in Section 1 of the Master Agreement.

"Equipment Location" means, as to any Equipment, the address at which such Equipment is located from time to time, as originally specified in the applicable Schedule and as subsequently specified in a notice delivered to Lessor pursuant to Section 9 of the Master Agreement, if applicable.

"Fair Market Value" means the total retail price that would be paid for any specified Equipment in an arm's length transaction between an informed and willing buyer under no compulsion to buy and an informed and willing seller under no compulsion to sell. Such total price shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"Fair Rental Value" means the amount of periodic rent that would be payable for any specified Equipment in an arm's length transaction between an informed and willing lessee and an informed and willing lessor, neither under compulsion to lease. Such amount shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"Final Invoice Amount" has the meaning set forth in the applicable Schedule.

"Financed Item" has the meaning specified in Section 1 of the Master Agreement.

"Financing" has the meaning specified in Section 1 of the Master Agreement.

"First Payment Date" means, as to any Lease or Financing, the date the first Rent payment with respect to the Initial Term of such Lease or the Term of such Financing (as applicable) is due, as determined pursuant to the terms of the applicable Schedule.

"Fundamental Agreements" means, collectively, the Master Agreement, each Schedule and Acceptance Certificate and all other related instruments and documents.

"Funding Date" means, with respect to any Financed Item, the date Lessor makes funds available to the Seller of such Financed Item to pay for the same or to Lessee to reimburse Lessee for its payment of the same.

"Guaranteed Obligations" has the meaning specified in Section 26(i) of the Master Agreement.

"Guarantor" means any guarantor of all or any portion of Lessee's obligations under the Master Agreement or any Lease or Financing.

"Hardware" means items of tangible equipment and other property, including but not limited to computer, telecommunications, printing, imaging, copying, scanning, projection and storage equipment, and any related peripherals, attachments, accessions, additions, substitutions, or replacements.

"Initial Term" means, as to any Lease, the initial term thereof as specified in the applicable Schedule.

"Lease" has the meaning specified in Section 1 of the Master Agreement.

"Lessee" has the meaning specified in the preamble of the Master Agreement.

"Lessee Affiliate" means any corporation which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Lessee.

"Lessee Default" has the meaning specified in Section 18 of the Master Agreement.

"Lessor" has the meaning specified in the preamble of the Master Agreement.

(Rev. 9.05)

7

"**License Agreement**" means any license agreement or other document granting a right to use Software or any technical information, confidential business information or other documentation relating to Hardware or Software, as amended, modified or supplemented by any other agreement between the licensor and Lessor.

"**Maintenance Service**" means the applicable Supplier's maintenance service at its then standard rates for Equipment of that age, if available.

"**Master Agreement**" has the meaning specified in the preamble of the Master Agreement.

"**Material Agreements**" means, collectively, all Fundamental Agreements, all other material agreements by and between Lessor and Lessee, and any application for credit, financial statement, or financial data required to be provided by Lessee in connection with any Lease or Financing.

"**Optional Additions**" has the meaning specified in Section 8 of the Master Agreement.

"**PC Equipment**" means, collectively, personal computers (e.g., workstations, desktops and notebooks) and related items of peripheral equipment (e.g., monitors, printers and docking stations).

"**Purchase Documents**" means, as to any Equipment, any purchase order, contract, bill of sale, License Agreement, invoice and/or other documents that Lessee has, at any time, approved, agreed to be bound by or entered into with any Supplier of such Equipment relating to the purchase, ownership, use or warranty of such Equipment.

"**Renewal Agreement**" has the meaning specified in the applicable Schedule.

"**Renewal Term**" has the meaning specified in the applicable Schedule.

"**Rent**" has the meaning specified in Section 3 of the Master Agreement.

"**Schedule**" has the meaning specified in Section 1 of the Master Agreement.

"**Seller**" means, as to any Equipment, the seller of such Equipment, and as to any Financed Item, the provider thereof, in either case as specified in the applicable Schedule.

"**Software**" means copies of computer software programs owned or licensed by Lessor.

"**Stipulated Loss Value**" means, as to any Equipment, an amount equal to the sum of (a) all Rent and other amounts due and owing with respect to such Equipment as of the date of payment of such amount, plus (b) the Casualty Value of such Equipment.

"**Supplier**" means (a) as to any Equipment, the Seller and the manufacturer or licensor of such Equipment collectively, or where the context requires, any of them, and (b) as to any Financed Item, the Seller thereof.

"**System Software**" means an item of Software that is pre-loaded on an item of Hardware purchased by Lessor for lease hereunder for which the relevant Purchase Documents specify no purchase price separate from the aggregate purchase price specified for such items of Hardware and Software.

"**Tax Benefits**" has the meaning specified in Section 14 of the Master Agreement.

"**Tax Loss**" has the meaning specified in Section 14 of the Master Agreement.

"**Taxes**" means all license and registration fees and all taxes, fees, levies, imposts, duties, assessments, charges and withholdings of any nature whatsoever, however designated (including, without limitation, any value added, transfer, sales, use, gross receipts, business, occupation, excise, personal property, real property, stamp or other taxes).

"**Term**" means, as to any Financing, the term thereof as specified in the applicable Schedule.

"**Then Applicable Term**" means, as to any Lease, the term of the Lease in effect at the time of determination, whether it be the Initial Term, any Renewal Term or any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to the applicable Schedule.

"**Total Cost**" means (a) as to any Lease, the total amount of Equipment, and related charges, if any, stated in and subject to such Schedule, and (b) as to any Financing, the total amount of the Financed Items subject to such Financing.

"**Total Term**" means, as to any Lease, the aggregate term of such Lease, including the Initial Term, any Renewal Term and any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to the applicable Schedule.

"**UCC**" means the Uniform Commercial Code as enacted and in effect in any applicable jurisdiction.

"**Unit of Equipment**" means, as to the Equipment leased pursuant to any Schedule, (a) each individual item of PC Equipment leased pursuant to such Schedule, and (b) all Equipment taken as a whole leased pursuant to such Schedule other than PC Equipment.

(Rev. 9.05)
8

# EXHIBIT 2

COUNTERPART NO. _____ OF _____. TO THE EXTENT THAT THIS SCHEDULE CONSTITUTES CHATTEL PAPER (AS DEFINED IN THE UCC), NO SECURITY INTEREST IN THIS SCHEDULE MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

Master Agreement Number 104529
Schedule Number 104529000005

## MASTER LEASE AND FINANCING AGREEMENT SCHEDULE

HEWLETT-PACKARD FINANCIAL SERVICES COMPANY[1] ("Lessor") and The Harman Press ("Lessee") are parties to the Master Lease and Financing Agreement identified by the Master Agreement Number specified above (the "Master Agreement"). This Schedule (which shall be identified by the Schedule Number specified above) and the Master Agreement together comprise a separate Lease, a separate Financing or a separate Lease and [a separate] Financing, as the case may be, between the parties. The terms and conditions of the Master Agreement are hereby incorporated by reference into this Schedule. All capitalized terms used in this Schedule without definition have the meanings ascribed to them in the Master Agreement.

**1.    LEASE.**
**A.    Description of Items of Leased Equipment**                      **Total Cost**
See Attached Exhibit A                                                       **$573,500.00**

**B.    Initial Term:** 60 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

**2.    FINANCING.**
**A.    Description of Financed Items**                               **Total Cost**
See Attached Exhibit A                                                       **$38,500.00**

**B.    Term:** 60 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

**3.    RENT:**
For Lease:        $10,297.94
For Financing:   $    756.52
Total Rent:       $11,054.46

**RENT is payable:**        ___ in advance   _X_ in arrears (check one)
                             _X_ monthly     ___ quarterly (check one)

**DAILY RENT:**
For Lease:  N/A (i.e., the Rent payment specified above expressed on a per diem basis, assuming a 360 day year and 30 day months)
For Financing:  N/A (based on the Financing Rate, and interest only)

**For Financings, the "Financing Rate" generally equals the rate of interest that would cause the present value of the Rent payable over the Term, calculated as of the First Payment Date and assuming monthly or quarterly (as applicable) compounding, to equal the Total Cost of the Financed Items.**

Lessee shall pay Lessor (a) on the first day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in advance, or (b) on the last day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in arrears, the Rent payment specified above for the length of the Initial Term in the case of a Lease and for the length of the Term in the case of a Financing. The First Payment Date shall be the first day (if Rent is payable in advance) or the last day (if Rent is payable in arrears) of the month or quarter (as applicable) immediately following the month or quarter (as applicable) in which the Acceptance Date occurs. In addition, on the First Payment Date Lessee shall also pay Lessor (a) in the case of Leases an amount equal to the Daily Rent multiplied by (i) 15 days if Rent is payable monthly or (ii) 45 days if Rent is payable quarterly; or (b) in the case of Financings an amount equal to the Daily Rent multiplied by the number of days from and including the Funding Date up to but excluding the first day of the month or quarter (as applicable) in which the First Payment Date occurs.

For Financings, all payments of Rent will be deemed to be blended payments of principal and interest (which interest will be calculated and payable at the Financing Rate), other than (a) Daily Rent, which is interest only, and (b) if Rent is payable in advance, the first periodic payment of Rent which is principal only. All payments of Rent with respect to Financings will be applied first to accrued and unpaid interest and next on account of principal, with interest on overdue amounts calculated and payable in accordance with the Master Agreement.

**4.    PRICING EXPIRATION DATE:** 4/30/2019. Lessor's obligation to purchase and lease the Equipment or fund or finance the Financed Items is subject to the Acceptance Date being on or before the Pricing Expiration Date.

**5.    EQUIPMENT LOCATION:** See Attached Exhibit A

**6.    SELLER:** See Attached Exhibit A

**7.    LESSEE'S END-OF-LEASE-TERM OPTIONS.** Lessee may choose to exercise one of the following options upon the natural expiration of the Initial Term, any Renewal Term (as defined below) and any automatic extension of the Initial Term or any Renewal Term provided, however, that Lessee must give Lessor written notice of Lessee's choice ("End-of-Term Notice") not less than ninety (90) days before the expiration of the relevant term.
      **(a) Purchase Option.** Lessee may elect to purchase any or all Units of Equipment then subject to this Lease (other than items of Software that may not be sold by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Market Value of such Units of Equipment as of the end of the Then Applicable Term, provided no Lessee Default shall have occurred and be continuing. In the event of such an election, Lessee shall pay such amount to Lessor, in immediately available funds, on or before the last day of the Then Applicable Term. If Lessee shall have so elected to purchase any of the Units of Equipment, shall have so paid the applicable purchase price and shall have fulfilled the terms and conditions of the Master Agreement, then on the last day of the Then Applicable Term (1) the Lease with respect to such Units of Equipment shall terminate and, except as provided in Section 26(m) of the Master Agreement, Lessee shall be relieved of all of its

--------------------------------------------------------------------------

[1] Authorized to do business in the name of HEWLETT-PACKARD FINANCIAL SERVICES COMPANY in the States of Alabama and New York.

obligations in favor of Lessor with respect to such Units of Equipment, and (2) Lessor shall transfer all of its interest in such Units of Equipment to Lessee "AS IS, WHERE IS," without any representation, warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. In the event Lessor and Lessee are unable to agree on the Fair Market Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

(b) **Renewal Option.** Lessee may elect to renew the Lease with respect to any or all Units of Equipment then subject to this Lease (other than items of Software that may not be re-leased by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Rental Value of such Units of Equipment as of the end of the Then Applicable Term. In the event of such an election, Lessee shall enter into a mutually agreeable renewal agreement with Lessor ("Renewal Agreement") on or before the last day of the Then Applicable Term confirming the Units of Equipment as to which the Lease is to be renewed, the period for which the Lease is to be renewed (the "Renewal Term"), and the amount of Rent and the times at which such Rent is to be payable during the Renewal Term. In the event Lessor and Lessee are unable to agree on the Fair Rental Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

(c) **Return.** Lessee may elect to return any or all of the Units of Equipment then subject to this Lease in accordance with Section 7 of the Master Agreement.

(d) **AUTOMATIC EXTENSION. IF LESSEE FAILS TO DELIVER TO LESSOR AN END-OF-TERM NOTICE BY THE DATE SET FORTH HEREIN, THE INITIAL TERM OR RENEWAL TERM SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT THEN SUBJECT TO THIS LEASE THROUGH THE END OF THE CALENDAR MONTH FALLING AT LEAST 90 DAYS AFTER THE DATE LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO THIS LEASE. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.**

**IF LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO A LEASE, BUT SHALL HAVE SUBSEQUENTLY FAILED TO COMPLY WITH ITS OBLIGATIONS ARISING FROM ITS ELECTIONS SPECIFIED THEREIN, THEN THE THEN APPLICABLE TERM OF THIS LEASE SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT AS TO WHICH LESSEE SHALL HAVE SO FAILED TO COMPLY WITH ITS OBLIGATIONS THROUGH THE END OF THE CALENDAR MONTH IN WHICH LESSEE SHALL HAVE COMPLIED WITH SUCH OBLIGATIONS. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.**

Notwithstanding any of the provisions of this Section 7 to the contrary, if any Lessee Default shall have occurred and be continuing at any time during the last 90 days of the Then Applicable Term of this Lease, Lessor may cancel any Renewal Term or optional or other automatic extension of the Then Applicable Term immediately upon written notice to Lessee.

8.     **ADJUSTMENTS TO SCHEDULE.** Lessee acknowledges that the Total Cost of Equipment and Financed Items and the related Rent payments set forth in this Schedule may be estimates, and if the final invoice from the Seller specifies a Total Cost that is more or less than the Total Cost set forth in this Schedule, Lessee hereby authorizes Lessor to adjust the applicable Total Cost and Rent payment on this Schedule to reflect the final invoice amount (the "Final Invoice Amount"). However, if the Final Invoice Amount exceeds the estimated Total Cost by more than 5%, Lessor will notify Lessee and obtain Lessee's prior written approval of the aforementioned adjustments. If Lessee fails to so approve any such adjustments within 15 days of Lessor's request, then this Schedule shall terminate without penalty to either Lessor or Lessee and Lessee shall be solely responsible to the Supplier for all obligations arising under the applicable Purchase Documents, including, without limitation, the obligation to purchase Equipment and pay Financed Items. All references in this Schedule to Total Cost and Rent shall mean the amounts thereof specified herein, as adjusted pursuant to this Section. Lessee also acknowledges that the Equipment and Financed Items described herein may differ from the description of the Equipment and Financed Items set forth in the related Acceptance Certificate executed by Lessee. Lessee hereby authorizes Lessor to conform the description of the Equipment and Financed Items set forth herein to the description thereof in the related Acceptance Certificate executed by Lessee. All references in this Schedule to the Equipment subject to a Lease and the Financed Items subject to a Financing shall mean the Equipment and Financed Items described herein, as conformed to the related Acceptance Certificate pursuant to this Section.

9.     **ADDITIONAL PROVISIONS:  N/A**

LESSOR AGREES TO LEASE TO LESSEE AND LESSEE AGREES TO LEASE FROM LESSOR THE EQUIPMENT DESCRIBED IN SECTION 1.A ABOVE, IF ANY, AND LESSOR AND LESSEE AGREE TO ENTER INTO A FINANCING OF THE FINANCED ITEMS DESCRIBED IN SECTION 2.A ABOVE, IF ANY.  SUCH LEASE AND/OR FINANCING WILL BE GOVERNED BY THE MASTER AGREEMENT AND THIS SCHEDULE, INCLUDING THE IMPORTANT ADDITIONAL TERMS AND CONDITIONS SET FORTH ABOVE.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS SCHEDULE AND THE MASTER AGREEMENT, THE TERMS OF THIS SCHEDULE SHALL GOVERN.

| **LESSEE:**<br>The Harman Press | **LESSOR:**<br>HEWLETT-PACKARD FINANCIAL SERVICES COMPANY[2] |
|---|---|
| By: | By: |
| Name: PHILLIP GOLDNER | Name: |
| Title: PRESIDENT | Title: |
| Date: 4/8/19 | Date: |

---

[2] Authorized to do business in the name of HEWLETT-PACKARD FINANCIAL SERVICES COMPANY in the States of Alabama and New York.

**The Harman Press**
**Exhibit A**
**Schedule Number: 104529000005**

| Vendor | Invoice Number | Invoice Date | Producer Name | Part Number | Equipment Description | Qty | Unit Price | Extended Price | Rent | Lease Rate | Equipment Location | Term |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indigo America | 54019 | 19 Mar 2019 | HP | CA315A | Indigo 7900 Digital Printing Press, 160ppm, 2438x2438dpi | 1 | $ 264,000.00 | $ 264,000.00 | $ 4,740.46 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | CA397-05491 | Basic Smart Uptime Kit | 1 | $ 11,000.00 | $ 11,000.00 | $ 197.52 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | CK940C | Indigo Special Effects 7X00 Option | 1 | $ 10,000.00 | $ 10,000.00 | $ 179.56 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0G97B | DFE Outer PC Stand | 1 | $ 1,500.00 | $ 1,500.00 | $ 26.93 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0H72C | Smart Stream Production Pro V6 IN100 Z840 Print Server | 1 | $ 85,000.00 | $ 85,000.00 | $ 1,526.29 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0J17C | One Shot Option | 1 | $ 30,000.00 | $ 30,000.00 | $ 538.69 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0J38A | Chiller | 1 | $ 30,000.00 | $ 30,000.00 | $ 538.69 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0J79D | Alert Agent Option | 1 | $ 30,000.00 | $ 30,000.00 | $ 538.69 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0J86A | Optimizer | 1 | $ 30,000.00 | $ 30,000.00 | $ 538.69 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | Q5020B | Indigo Thick Substrate Kit | 1 | $ - | $ - | $ - | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | Q5211D | White Ink Hardware Kit | 1 | $ 7,000.00 | $ 7,000.00 | $ 125.69 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | Q5216D | 6th Color Option | 1 | $ 20,000.00 | $ 20,000.00 | $ 359.13 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | Q5217D | 7th Color Option | 1 | $ 20,000.00 | $ 20,000.00 | $ 359.13 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | T3P20A | Thick Substrate Kit | 1 | $ 15,000.00 | $ 15,000.00 | $ 269.34 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | T3P45B | On-press Fast Ink Replacement | 1 | $ 20,000.00 | $ 20,000.00 | $ 359.13 | 0.01796 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| | | | | | | | **Leased Totals:** | $ 573,500.00 | $ 10,297.94 | | | |

| Vendor | Invoice Number | Invoice Date | Producer Name | Part Number | Equipment Description | Qty | Unit Price | Extended Price | Rent | Lease Rate | Equipment Location | Term |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indigo America | 54019 | 19 Mar 2019 | HP | 5189-1830 | 170GSN Gloss Paper | 2 | $ - | $ - | $ - | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | H0H30B | SmartStream Designer V9.0 for Adobe Creative Cloud Site License | 1 | $ 1,500.00 | $ 1,500.00 | $ 29.47 | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | MCH-0116-51 | 1l Alcohol IPA Assembly | 1 | $ - | $ - | $ - | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | MCH-1652-01 | 5gal Ethylene Glycol | 2 | $ - | $ - | $ - | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | MM-0069 | Delivery Installation Training | 1 | $ 29,000.00 | $ 29,000.00 | $ 569.84 | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | MM-0116 | 4-Day Indigo Production Optimization Visit | 1 | $ 8,000.00 | $ 8,000.00 | $ 157.20 | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| Indigo America | 54019 | 19 Mar 2019 | HP | Q5391-02612 | Consumable Installation Kit | 1 | $ - | $ - | $ - | 0.01965 | 6840 Vineland Ave. , North Hollywood, CA 91605, USA | 60 |
| | | | | | | | **Financed Totals:** | $ 38,500.00 | $ 756.52 | | | |

| | | |
|---|---|---|
| **Grand Totals:** | $ 612,000.00 | $ 11,054.46 |

# EXHIBIT 3

# AMENDMENT TO MASTER LEASE AND FINANCING AGREEMENT SCHEDULE

This Amendment to Master Lease and Financing Agreement Schedule (this "***Amendment***") is made by and between **The Harman Press** ("***Lessee***"), and Hewlett-Packard Financial Services Company, a Delaware corporation ("***HPFS***").

## WITNESSETH:

Whereas Lessee and HPFS entered into that certain Master Lease and Financing Agreement Schedule No. 104529000005 (together with any Schedules, exhibits, annexes and amendments thereto collectively, the "***Lease Agreement***").

**NOW, THEREFORE**, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, it is hereby agreed as follows:

1. **Definitions**. Unless otherwise defined herein, words and expressions defined in the Lease Agreements, as amended hereby, shall bear the same meanings when used herein.

2. **Amendment to Payment Structure of the Lease Agreement.** The Lease Agreement is hereby amended as follows:

| Lease | 9/1/2020 | |
|---|---|---|
| 1 | 9/30/2020 | 0 |
| 2 | 10/31/2020 | 3,380.16 |
| 3 | 11/30/2020 | 3,380.16 |
| 4 | 12/31/2020 | 3,380.16 |
| 5 | 1/31/2021 | 12,496.69 |
| 6 | 2/28/2021 | 12,496.69 |
| 7 | 3/31/2021 | 12,496.69 |
| 8 | 4/30/2021 | 12,496.69 |
| 9 | 5/31/2021 | 12,496.69 |
| 10 | 6/30/2021 | 12,496.69 |
| 11 | 7/31/2021 | 12,496.69 |
| 12 | 8/31/2021 | 12,496.69 |
| 13 | 9/30/2021 | 12,496.69 |
| 14 | 10/31/2021 | 12,496.69 |
| 15 | 11/30/2021 | 12,496.69 |
| 16 | 12/31/2021 | 12,496.69 |
| 17 | 1/31/2022 | 12,496.69 |
| 18 | 2/28/2022 | 12,496.69 |
| 19 | 3/31/2022 | 12,496.69 |
| 20 | 4/30/2022 | 12,496.69 |
| 21 | 5/31/2022 | 12,496.69 |
| 22 | 6/30/2022 | 12,496.69 |
| 23 | 7/31/2022 | 12,496.69 |
| 24 | 8/31/2022 | 12,496.69 |
| 25 | 9/30/2022 | 12,496.69 |
| 26 | 10/31/2022 | 12,496.69 |

| 27 | 11/30/2022 | 12,496.69 |
| 28 | 12/31/2022 | 12,496.69 |
| 29 | 1/31/2023 | 12,496.69 |
| 30 | 2/28/2023 | 12,496.69 |
| 31 | 3/31/2023 | 12,496.69 |
| 32 | 4/30/2023 | 12,496.69 |
| 33 | 5/31/2023 | 12,496.69 |
| 34 | 6/30/2023 | 12,496.69 |
| 35 | 7/31/2023 | 12,496.69 |
| 36 | 8/31/2023 | 12,496.69 |
| 37 | 9/30/2023 | 12,496.69 |
| 38 | 10/31/2023 | 12,496.69 |
| 39 | 11/30/2023 | 12,496.69 |
| 40 | 12/31/2023 | 12,496.69 |
| 41 | 1/31/2024 | 12,496.69 |
| 42 | 2/29/2024 | 12,496.69 |
| 43 | 3/31/2024 | 12,496.69 |
| 44 | 4/30/2024 | 12,496.69 |
| 45 | 5/31/2024 | 12,496.69 |
| 46 | 6/30/2024 | 12,496.69 |
| 47 | 7/31/2024 | 12,496.69 |
| 48 | 8/31/2024 | 12,496.69 |
| 49 | 9/30/2024 | 12,496.69 |
| 50 | 10/31/2024 | 12,496.69 |
| 51 | 11/30/2024 | 12,496.69 |
| 52 | 12/31/2024 | 12,496.69 |
| 53 | 1/31/2025 | 12,496.69 |
| 54 | 2/28/2025 | 12,496.69 |
| 55 | 3/31/2025 | 12,496.69 |
| 56 | 4/30/2025 | 12,496.69 |

3. **No Other Amendment.** All other terms and conditions of the Lease Agreement shall remain in full force and effect and the Lease Agreement shall be construed as if the terms of this Amendment were included therein.

**IN WITNESS WHEREOF, THE FOREGOING AMENDMENT IS HEREBY AGREED TO, ACKNOWLEDGED AND ACCEPTED BY LESSEE AND HPFS:**

THE HARMAN PRESS

By: _____

Name: PHILLIP GOLDNER

Title: PRESIDENT

10/22/20

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY

By: _____

Name: _____

Title: _____

# EXHIBIT 4

**UCC FINANCING STATEMENT**

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company    1-800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

1378 88981

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: California
(S.O.S.)

Initial Filing #: 177612552329
Initial Book #:
Initial Page #:
Initial Filing Date: 10/24/2017

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME The Harman Press | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1227 North Highland Avenue | CITY Los Angeles | STATE CA | POSTAL CODE 90038 | COUNTRY USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Hewlett-Packard Financial Services Company | | | |
|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 200 Connell Drive | CITY Berkeley Heights | STATE NJ | POSTAL CODE 07922 | COUNTRY USA |

4. **COLLATERAL:** This financing statement covers the following collateral:
All equipment and software now or hereafter acquired, which Secured Party has leased to or financed for Debtor, including, but not limited to, computer, printing, imaging, copying, scanning, projection and storage equipment, any and all related peripherals, attachments, accessions, additions, general intangibles, substitutions, supplies, replacements, and any right, title or interest in any license for any software used to operate or otherwise installed in any of the foregoing, and products and proceeds of all of the foregoing (including insurance proceeds).

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

1378 88981

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)
This document was auto-generated from data received from the California Department of State

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# EXHIBIT 5

04/27/2022
HPFS
Harman Press (2597031569)
Contract #104529000005.REST                    Accelerated AR Statement

| Due Date | Inv. Control # | Invoice Type | Invoice Total | Pre-Petition | Post-Petition Past Due | Post-Petition Future Due |
|---|---|---|---|---|---|---|
| | | | $587,344.43 | $37,490.07 | $87,476.83 | $462,377.53 |
| 06/30/2021 | 304267576 | Firm Rent | 12,496.69 | 12,496.69 | | |
| 07/31/2021 | 304291369 | Firm Rent | 12,496.69 | 12,496.69 | | |
| 08/31/2021 | 304313994 | Firm Rent | 12,496.69 | 12,496.69 | | |
| 09/30/2021 | 304335614 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 10/31/2021 | 304356865 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 11/30/2021 | 304379370 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 12/31/2021 | 304400917 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 01/31/2022 | 304421055 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 02/28/2022 | 304439736 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 03/31/2022 | 304462552 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 04/30/2022 | 304481992 | Firm Rent | 12,496.69 | | | 12,496.69 |
| 05/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 06/30/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 07/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 08/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 09/30/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 10/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 11/30/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 12/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 01/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 02/28/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 03/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 04/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 05/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 06/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 07/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 08/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 09/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 10/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 11/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 12/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 01/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 02/29/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 03/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 04/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 05/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 06/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 07/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 08/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 09/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 10/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 11/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 12/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 01/31/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 02/28/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 03/31/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 04/30/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |

# EXHIBIT 6

**Calzadilla, Glenys**

| | |
|---|---|
| **From:** | Morgan, Diane |
| **Sent:** | Tuesday, April 26, 2022 10:18 AM |
| **To:** | Sridhar, Drushya |
| **Cc:** | Calzadilla, Glenys; Hamani, Miral |
| **Subject:** | FW: HPFS - Harman Press |

Please see confirmation below.

Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000
Berkeley Heights, NJ 07922



\* \* \* \* \* NON-BINDING AND CONFIDENTIAL \* \* \* \* \*

Any offers, counteroffers or related materials contained in this e-mail transmission and any accompanying attachments do not constitute a binding agreement until such time as a written document is executed by all necessary parties.  Further, this e-mail transmission and any accompanying attachments may contain information from Hewlett-Packard Financial Services Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is intended only for the use of the named recipient(s). If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should be returned to this sender immediately. In this regard, if you have received this e-mail message in error, please notify us by reply e-mail immediately. Thank you.

**From:** Fred Goldner
**Sent:** Tuesday, April 26, 2022 10:16 AM
**To:** Morgan, Diane
**Subject:** Re: HPFS - Harman Press

Yes I received this email and you can schedule to pick the Indigo

On Apr 26, 2022, at 7:10 AM, Morgan, Diane <diane.morgan@hpe.com> wrote:

Hi Fred,
Please confirm that you have received the email below, and that you have decided to return the equipment.
Thanks again,
Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000

Berkeley Heights, NJ 07922

<image001.png>

* * * * * NON-BINDING AND CONFIDENTIAL * * * * *

Any offers, counteroffers or related materials contained in this e-mail transmission and any accompanying attachments do not constitute a binding agreement until such time as a written document is executed by all necessary parties.  Further, this e-mail transmission and any accompanying attachments may contain information from Hewlett-Packard Financial Services Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is intended only for the use of the named recipient(s). If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should be returned to this sender immediately. In this regard, if you have received this e-mail message in error, please notify us by reply e-mail immediately. Thank you.

**From:** Morgan, Diane
**Sent:** Tuesday, April 26, 2022 9:55 AM
**To:** Fred Goldner
**Subject:** RE: HPFS - Harman Press

Hi Fred,
Thank you for filling out the return form and sending it back to me.  Our returns group will notify you directly to schedule the de-install and pickup of the equipment.
We appreciate your cooperation in helping facilitate the return.
Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000
Berkeley Heights, NJ 07922

<image001.png>

* * * * * NON-BINDING AND CONFIDENTIAL * * * * *

Any offers, counteroffers or related materials contained in this e-mail transmission and any accompanying attachments do not constitute a binding agreement until such time as a written document is executed by all necessary parties.  Further, this e-mail transmission and any accompanying attachments may contain information from Hewlett-Packard Financial Services Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is intended only for the use of the named recipient(s). If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should be returned to this sender immediately. In this regard, if you have received this e-mail message in error, please notify us by reply e-mail immediately. Thank you.

**From:** Fred Goldner
**Sent:** Monday, April 25, 2022 6:16 PM
**To:** Morgan, Diane
**Subject:** Re: HPFS - Harman Press

On Apr 25, 2022, at 3:10 PM, Morgan, Diane                                        wrote:

Hi Fred,
As I haven't heard back regarding the possibility of a restructure, we need to move
forward in picking up the press, and have notified our counsel accordingly.

I'm attaching the return form which needs to be filled out and returned by tomorrow,
along with providing contact information (phone # and email address)
of the person from your company who will be responsible for working with us to
facilitate the return.

Thank you,

Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000
Berkeley Heights, NJ 07922


<image001.png>

* * * * * NON-BINDING AND CONFIDENTIAL * * * * *

Any offers, counteroffers or related materials contained in this e-mail transmission and any
accompanying attachments do not constitute a binding agreement until such time as a written
document is executed by all necessary parties.  Further, this e-mail transmission and any
accompanying attachments may contain information from Hewlett-Packard Financial Services
Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is
intended only for the use of the named recipient(s). If you are not an intended recipient, you are
hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on
the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should
be returned to this sender immediately. In this regard, if you have received this e-mail message
in error, please notify us by reply e-mail immediately. Thank you.

<HPFS - Return Form - Harman Press..xlsx>


Thank You,

Fred Goldner


<image002.png>

6840 Vineland Avenue
North Hollywood, CA 91605


Please stay safe.

<HPFS - Return Form - Harman Press..xlsx>

Thank You,

Fred Goldner



6840 Vineland Avenue
North Hollywood, CA 91605

Please stay safe.

# EXHIBIT 7

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Robert M. Saunders (CA Bar No. 226172)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, California  90067<br>Tel:  (310) 277-6910; Fax:  (310) 201-0760<br>Email:  rsaunders@pszjlaw.com<br><br>Ayala A. Hassell (TX SBN 01009800) (Pro Hac Vice)<br>PACHULSKI STANG ZIEHL & JONES LLP<br>440 Louisiana Street, Suite 900<br>Houston, TX 77002<br>T: (713) 691-9385; Email: ahassell@pszjlaw.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Movant | |

<table>
<tr><td colspan="2" align="center"><b>UNITED STATES BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION</b></td></tr>
<tr><td>In re:<br><br>The Harman Press Inc.,<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Debtor(s).</td><td>CASE NO.: 1:21-bk-11544-MT<br><br>CHAPTER: 11<br><br><b>NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362<br>(with supporting declarations)<br>(PERSONAL PROPERTY)</b><br><br>DATE:     TBD<br>TIME:     TBD<br>COURTROOM:  302</td></tr>
<tr><td colspan="2"><b>Movant:  Hewlett-Packard Financial Services Company</b></td></tr>
</table>

1.  **Hearing Location**:

☐ 255 East Temple Street, Los Angeles, CA 90012    ☐ 411 West Fourth Street, Santa Ana, CA 92701

☒ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☐ 1415 State Street, Santa Barbara, CA 93101

☐ 3420 Twelfth Street, Riverside, CA 92501

2.  Notice is given to the Debtor and trustee (if any)(Responding Parties) , their attorneys (if any), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay, as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached motion.

3.  To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1 .RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                     Page 1                  **F 4001-1.RFS.PP.MOTION**
DOCS_LA:343497.1 35882/003

4. When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5. If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6. ☐ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d). If you wish to oppose this motion, you must file a written response to this motion with the court and serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above no less than 14 days before the hearing and appear at the hearing of this motion.

7. ☒ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b). If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

   a. ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

   b. ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

   c. ☒ An application for order setting hearing on shortened notice and remains pending. After the court has ruled on that application, you will be served with another notice or an order that will specify the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.


Date: April 29, 2022                                 PACHULSKI STANG ZIEHL & JONES LLP
                                                     _____
                                                     Printed name of law firm (if applicable)

                                                     Robert M. Saunders
                                                     _____
                                                     Printed name of individual Movant or attorney for Movant



                                                     */s/ Robert M. Saunders*
                                                     _____
                                                     Signature of individual Movant or attorney for Movant

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# MOTION FOR RELIEF FROM THE AUTOMATIC STAY AS TO PERSONAL PROPERTY

1. Movant has a perfected security interest in the Property.

2. **The Property at Issue (Property):**

   a. ☐ Vehicle (*year, manufacturer, type, and model*):

   Vehicle Identification Number:
   Location of vehicle (*if known*):

   b. ☒ Equipment (*manufacturer, type, and characteristics*): Indigo 7900 Digital Printing Press, 160ppm, 2438dpi

   Serial number(*s*): 47100533

   Location (*if known*): Believed to be located at 6840 Vineland Ave., North Hollywood, CA 91605

   c. ☐ Other Personal Property *(type, identifying information, and location):*

3. **Bankruptcy Case History:**

   a. ☒ A voluntary bankruptcy petition   ☐ An involuntary bankruptcy petition
   under chapter   ☐ *7*   ☒ 11   ☐ 12   ☐ 13 was filed on (*date*) 09/20/2021 .

   b. ☐ An order to convert this case to chapter   ☐ *7*   ☐ 11   ☐ 12   ☐ 13 was entered on (*date*) _____.

   c. ☐ Plan was confirmed on (*date*) _____.

4. **Grounds for Relief from Stay:**

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists to grant Movant the requested relief from stay as follows:

   (1) ☒ Movant's interest in the Property is not adequately protected.

      (A) ☒ Movant's interest in the Property is not protected by an adequate equity cushion.

      (B) ☒ The fair market value of the Property is declining and payments are not being made to Movant sufficient to protect Movant's interest against that decline.

      (C) ☐ Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with Debtor.

      (D) ☐ Other (*see attached continuation page*).

   (2) ☐ The bankruptcy case was filed in bad faith.

      (A) ☐ Movant is the only creditor, or one of very few creditors, listed or scheduled in the Debtor's case commencement documents.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                Page 3                                **F 4001-1.RFS.PP.MOTION**
DOCS_LA:343497.1 35882/003

(B) ☐ The Property was transferred to the Debtor either just before the bankruptcy filing or after the filing.

(C) ☐ A non-individual entity was created just prior to the bankruptcy petition date for the sole purpose of filing this bankruptcy case.

(D) ☐ Other bankruptcy cases were filed in which an interest in the Property was asserted.

(E) ☐ The Debtor filed only a few case commencement documents with the bankruptcy petition. Schedules and statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

(3) ☐ *(Chapter 12 or 13 cases only)* All payments on account of the Property are being made through the plan and plan payments have not been made to the chapter 12 or chapter 13 trustee for payments due
☐ postpetition preconfirmation   ☐ postpetition postconfirmation.

(4) ☐ The lease has matured, been rejected or deemed rejected by operation of law.

(5) ☐ The Debtor filed a statement of intention that indicates the Debtor intends to surrender the Property.

(6) ☐ Movant regained possession of the Property on (*date*)_____ , which is
☐ prepetition ☐ postpetition.

(7) ☒ For other cause for relief from stay, see attached continuation page.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and, pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary for an effective reorganization.

5. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor.

a. ☐ These actions were taken before Movant knew that the bankruptcy petition had been filed and Movant would have been entitled to relief from stay to proceed with those actions,

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions,

c. ☐ Other (*specify*):

6. ☒ **Evidence in Support of Motion: (*Declaration(s) must be signed under penalty of perjury and attached to this motion*)**

a. The PERSONAL PROPERTY DECLARATION on page 6 of this motion.

b. ☐ Supplemental declaration(s).

c. ☐ The statements made by the Debtor under penalty of perjury concerning Movant's claims and the Property as set forth in the Debtor's case commencement documents. Authenticated copies of the relevant portions of the case commencement documents are attached as Exhibit(s) ___.

d. ☐ Other:

7. **An optional Memorandum of Points and Authorities is attached to this motion.**

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*
DOCS_LA:343497.1 35882/003                                Page 4                                **F 4001-1.RFS.PP.MOTION**

**Movant requests the following relief:**

1. Relief from the stay is granted under: ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to repossess and sell the Property.

3. ☐ Confirmation that there is no stay in effect.

4. ☐ The stay is annulled retroactive to the petition date. Any postpetition actions taken by Movant to enforce its remedies regarding the Property do not constitute a violation of the stay.

5. ☐ The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7. ☐ The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

8. ☐ The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

9. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days, so that no further stay shall arise in that case as to the Property.

10. ☐ The order is binding and effective in any future bankruptcy case, no matter who the debtor may be
    ☐ without further notice, or ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

11. ☒ If relief from stay is not granted, the court orders adequate protection.

12. ☒ See continuation page for other relief requested

Date: April 29, 2022

PACULSKI STANG ZIEHL & JONES LLP
_____
Print name of law firm

Robert M. Saunders
_____
Print name of individual Movant or attorney for Movant


*/s/ Robert M. Saunders*
_____
Signature of individual Movant or attorney for Movant

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                 Page 5                          **F 4001-1.RFS.PP.MOTION**
DOCS_LA:343497.1 35882/003

# PERSONAL PROPERTY DECLARATION

I, (*name of declarant*) Glenys Calzadilla _____ , declare:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the Property (*specify*):

    a.  ☐  I am the Movant.

    b.  ☒  I am employed by Movant as (*title and capacity*):        AMS Collections and Recovery Manager

    c.  ☐  Other (*specify*):

2.  a.  ☒  I am one of the custodians of the books, records and files of Movant that pertain to loans, leases, or extensions of credit given to Debtor concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☐  Other (see attached):

3.  The Property is:

    a.  ☐  Vehicle (*year, manufacturer, type, model and year*):

        *Vehicle Identification Number*:
        *Location of vehicle (if known)*:

    b.  ☒  Equipment (*manufacturer, type, and characteristics*): Indigo 7900 Digital Printing Press, 160ppm, 2438dpi

        *Serial number*(s): 47100533
        *Location (if known)*: Believed to be located at 6840 Vineland Ave., North Hollywood, CA 91605
        *See attached Exhibit C*

    c.  ☐  Other personal property (*type, identifying information, and location*):

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4. The nature of Debtor's interest in the Property is:

    a.  ☐  Sole owner

    b.  ☐  Co-owner (*specify*):

    c.  ☒  Lessee

    d.  ☐  Other (*specify*):

    e.  ☒  Debtor  ☒ did  ☐ did not   list the Property in the schedules filed in this case.

5.  ☐  The lease matured or was rejected on (*date*) _____:

    a.  ☐  rejected

        (1)  ☐  by operation of law.

        (2)  ☐  by order of the court.

    b.  ☐  matured.

6. Movant has a perfected security interest in the Property.

    a.  ☐  A true and correct copy of the promissory note or other document that evidences the debt owed by the Debtor to Movant is attached as Exhibit ___.

    b.  ☐  The Property is a motor vehicle, boat, or other personal property for which a certificate of title is provided for by state law. True and correct copies of the following items are attached to this motion:

        (1)  ☐  Certificate of title ("pink slip") (Exhibit ___).

        (2)  ☐  Vehicle or other lease agreement (Exhibit ___).

        (3)  ☐  Security agreement (Exhibit ___).

        (4)  ☐  Other evidence of a security interest (Exhibit ___).

    c.  ☒  The Property is equipment, intangibles, or other personal property for which a certificate of title is not provided for by state law. True and correct copies of the following items are attached to this motion:

        (1)  ☒  Security agreement (Exhibit A and B).

        (2)  ☒  UCC-1 financing statement (Exhibit D).

        (3)  ☐  UCC financing statement search results (Exhibit ___).

        (4)  ☐  Recorded or filed leases (Exhibit ___).

        (5)  ☐  Other evidence of perfection of a security interest (Exhibit ___).

    d.  ☐  The Property is consumer goods. True and correct copies of the following items are attached to this motion:

        (1)  ☐  Credit application (Exhibit ___).

        (2)  ☐  Purchase agreement (Exhibit ___).

        (3)  ☐  Account statement showing payments made and balance due (Exhibit ___).

        (4)  ☐  Other evidence of perfection of a security interest (*if necessary under state law*) (Exhibit ___).

    e.  ☐  Other liens against the Property are attached as Exhibit ___.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                               Page 7                               **F 4001-1.RFS.PP.MOTION**
DOCS_LA:343497.1 35882/003

7. Status of Movant's debt:

   a. The amount of the monthly payment: $ 12,496.96 .

   b. Number of payments that became due and were not tendered:  ☒ prepetition  ☒ postpetition.

   c. Total amount in arrears: $ 124,966.90  See Exhibit E .

   d. Last payment received on (*date*): 05/31/2021 .

   e. Future payments due by the anticipated hearing date (*if applicable*): 05/18/2022
      An additional payment of $ 12,496.69 will come due on (*date*) 04/30/2022 , and on
      the        last        day of each month thereafter. If the payment is not received by the
      day of the month, a late charge of $                                  will be charged under the terms of the loan.

8. ☒ Attached as **Exhibit E** is a true and correct copy of a POSTPETITION payment history that accurately
   reflects the dates and amounts of all payments made by the Debtor since the petition date.

9. Amount of Movant's debt:

   a. Principal: .............................................................................................. $         587,344.43
   b. Accrued interest: ................................................................................. $
   c. Costs (attorney's fees, late charges, other costs):.................................... $         unknown
   d. Advances (property taxes, insurance): ...................................................... $         unknown
   e. TOTAL CLAIM as of                    :........................................................ $ Claim exceeds 587,344.43

10. ☒ (*Chapter 7 and 11 cases only*) Valuation: The fair market value of the Property is: $ **See d below and continuation page**.
    This valuation is based upon the following supporting evidence:

    a. ☐ This is the value stated for property of this year, make, model, and general features in the reference guide
       most commonly used source for valuation data used by Movant in the ordinary course of its business for
       determining the value of this type of property. True and correct copies of the relevant excerpts of the most
       recent edition of the reference guide are attached as Exhibit ___.

    b. ☐ This is the value determined by an appraisal or other expert evaluation. True and correct copies of the
       expert's report and/or declaration are attached as Exhibit ___.

    c. ☐ The Debtor's admissions in the Debtor's schedules filed in the case. True and correct copies of the relevant
       portions of the Debtor's schedules are attached as Exhibit ___.

    d. ☒ Other basis for valuation (*specify*):    Value is unknown and will depend, in part, upon how much
       refurbishment and repair will be required to be performed after Equipment recovery. Due to 3 year age
       depreciation and normal wear-and-tear, the value is at least lower than the initial Lease cost of $573,500.

    The statements made in the continuation page are part of this declaration.

    > **NOTE:** If valuation is contested, supplemental declarations providing additional foundation for the
    > opinions of value should be submitted.

11. Calculation of equity in Property:

    a. ☒ **11 U.S.C. § 362(d)(1) - Equity Cushion:**

       I calculate that the value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s)
       senior to Movant's debt is $ 0.00                              and is 0% of the fair market value of the
       Property.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                    Page 8                                    **F 4001-1.RFS.PP.MOTION**
DOCS_LA:343497.1 35882/003

b. ☐ **11 U.S.C. § 362(d)(2)(A) - Equity**:

By subtracting the total amount of all liens on the Property from the value of the Property as set forth in Paragraph 10 above, I calculate that the Debtor's equity in the Property is $ _____.

12. ☒ The fair market value of the Property is declining because:
The Property is a printing press and the value declines over time with continuing use of the Property.

13. ☐ The Debtor's intent is to surrender the Property. A true and correct copy of the Debtor's statement of intentions is attached as Exhibit ___.

14. ☐ Movant regained possession of the Property on (*date*)_____, which is:  ☐ prepetition  ☐ postpetition.

15. ☐ (*Chapter 12 or 13 cases only*) Status of Movant's debt and other bankruptcy case information:

a. The 341(a) meeting of creditors is currently scheduled for (or concluded on) (*date*) _____
A plan confirmation hearing is currently scheduled for (or concluded on) (*date*)_____
The plan was confirmed on (*if applicable*) (*date*) _____

b. Postpetition preconfirmation payments due BUT REMAINING UNPAID after the filing of the case:

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

(See attachment for additional breakdown of information attached as Exhibit ___.)

c. Postconfirmation payments due BUT REMAINING UNPAID after the plan confirmation date (*if applicable*):

| Number of Payments | Number of Late Charges | Amount of Each Payment or Late Charge | Total |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

d. Postpetition advances or other charges due but unpaid:    $
(*For details of type and amount, see Exhibit ___*)

e. Attorneys' fees and costs:    $
(*For details of type and amount, see Exhibit ___*)

f. Less suspense account or partial paid balance:    $ [            ]

TOTAL POSTPETITION DELINQUENCY:    $

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                          Page 9                          **F 4001-1.RFS.PP.MOTION**
DOCS_LA:343497.1 35882/003

g.  ☐  The entire claim is provided for in the chapter 12 or 13 plan and postpetition plan payments are delinquent. The plan payment history is attached as Exhibit ___. See attached declaration(s) of chapter 12 trustee or 13 trustee regarding receipt of payments under the plan *(attach LBR form F 4001-1.DEC.AGENT.TRUSTEE).*

16. ☐  Proof of insurance regarding the Property has not been provided to Movant, despite the Debtor's obligation to insure the collateral under the terms of Movant's contract with Debtor.

17. ☐  The bankruptcy case was filed in bad faith:

   a.  ☐  Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

   b.  ☐  Other bankruptcy cases have been filed in which an interest in the Property was asserted.

   c.  ☐  The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

   d.  ☐  Other *(specify):*


18. ☐  The filing of the bankruptcy petition was part of a scheme to delay, hinder, or defraud creditors that involved:

   a.  ☐  The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page for facts establishing the scheme.

   b.  ☐  Multiple bankruptcy cases affecting the Property:

      (1) Case name: _____
         Chapter: _____    Case number: _____
         Date filed: _____    Date discharged: _____    Date dismissed: _____
         Relief from stay regarding the Property ☐ was   ☐ was not granted.

      (2) Case name: _____
         Chapter: _____    Case number: _____
         Date filed: _____    Date discharged: _____    Date dismissed: _____
         Relief from stay regarding the Property ☐ was   ☐ was not granted.

      (3) Case name: _____
         Chapter: _____    Case number: _____
         Date filed: _____    Date discharged: _____    Date dismissed: _____
         Relief from stay regarding the Property ☐ was   ☐ was not granted.

      ☐  See attached continuation page for more information about other bankruptcy cases affecting the Property.

      ☐  See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, and defraud creditors.

19. ☐  Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

   a.  ☐  These actions were taken before Movant knew the bankruptcy case had been filed, and Movant would have been entitled to relief from stay to proceed with these actions.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

b. ☐ Although Movant knew the bankruptcy case was filed, Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit ___.

c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct

April 28, 2022
Date

Glenys Calzadilla
Printed Name

Signature

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

## **Continuation Page**

This Continuation Page is provided pursuant to, and incorporated in, the Motion for Relief from the Automatic Stay as to Personal Property (the "Motion") filed by Hewlett-Packard Financial Services Company ("Movant") in the Chapter 11, Subchapter V, bankruptcy case filed by The Harman Press Inc. ("Debtor"); case no. 1:21-bk-11544-MT (the "Case"), filed in the United States Bankruptcy Court for the Central District of California (San Fernando Valley) (the "Court") as additional grounds justifying relief from the stay and requesting additional relief as that set out and requested in the Motion.

1.     The Debtor and Movant entered into a Master Lease and Financing Agreement, number 104529, on or about October 17, 2008, which is attached hereto as **Exhibit A** (the "Master Lease"). On or about April 24, 2019, the Debtor and Movant executed the Master Lease and Financing Agreement Schedule number 104529000005 (the "Lease Schedule"), which was amended pursuant to the Amendment to Master Lease and Financing Agreement Schedule dated as of October 22, 2020 (the "Amendment").  The Lease Schedule and Amendment are attached hereto as **Exhibit B**. (The Master Lease, Lease Schedule, and Amendment, together with all schedules, exhibits, annexes and amendments thereto, collectively are referred to as the "Lease").

2.     Pursuant to the Lease, the Debtor leased from Movant an Indigo 7900 Digital Printing Press, 160ppm, 2438x2438dpi, bearing serial no. 47100533 and related equipment and accessories described in **Exhibit C** attached hereto (the "Equipment").

3.     As further protection of Movant's interest in the Equipment, the Lease also contains a purchase money security interest in the Equipment, granted by Debtor to the Movant, which security interest is properly perfected by a filed UCC-1 financing statement, a copy of which is attached hereto as **Exhibit D**.

4.      Attached as **Exhibit E** is a true and correct copy of a POSTPETITION payment history that accurately reflects the dates and amounts of all payments made by the Debtor since the petition date.

5.      The Equipment consists of a large printing press and necessary cooling equipment manufactured by Hewlett Packard Inc. ("HPI"), a third-party entity with which Movant has contracted to de-install and recover the Equipment because such de-installation and recovery requires special expertise possessed by HPI.

6.      Pursuant to the Lease, the Debtor is obligated to pay to Movant $12,496.69 in rent payments per month.  Since the filing of the Case, and for months prior thereto, the Debtor has not made any payments to Movant and remains in default under the Lease. As of the date of this Motion, the Debtor owes Movant $37,490.07 in pre-petition rent and $87,476.83 in post-petition rent, totaling $124,966.90 in unpaid rent.

7.      Pursuant to the email attached as **Exhibit F**, which is one of Movant's business records kept in the ordinary course of its business, Movant was notified on or about April 26, 2022, by the Debtor that it agrees to allow Movant to recover the Equipment from the Debtor's premises.

8.      Movant has contracted with HPI to recover the Equipment upon this Court granting relief from the automatic stay to permit recovery of the Equipment.

9.      Therefore, for the reasons described above, cause exists to grant Movant relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to allow Movant and/or HPI to enter Debtor's premises and/or previously leased premises, wherever the Equipment is located, and de-install and recover the Equipment.

10.     The Debtor has no equity in the Equipment because the Debtor is a lessee and not the owner of the Equipment.  The value of the Equipment is unknown and will depend, in part,

upon how much refurbishment and repair will be required to be performed upon recovery of the Equipment.  Due to the 3-year age depreciation and normal wear-and-tear, the value of the Equipment is expected to be at least lower than the initial Lease cost of $573,500.  Therefore, even if the Debtor owned the Equipment, since the total amount owed by the Debtor under the Lease is at least $587,344.43 (including future rents owed under the Lease), the Debtor would have no equity in the Equipment.

11.    Additionally, the extended deadline for the Debtor to file its plan in this Case was April 27, 2022, and as of the filing of this Motion, no such plan was filed on the Case docket. Therefore, Movant believes the Debtor has no reasonable prospects for a successful reorganization and, for the reasons described above, cause exists to grant Movant relief from the stay to recover the Equipment pursuant to 11 U.S.C. § 362(d)(2).

WHEREFORE, the Movant respectfully requests that the Court enter an order granting relief from the automatic stay under 11 U.S.C. § 362(d)(1) and 11 U.S.C. § 362(d)(2) so that Movant and/or its designee, HPI, can enter the Debtor's premises and recover the Equipment (including performing any de-installation procedures necessary for the removal of the Equipment). Movant further requests that the order be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 of the United States Code, and for such other and further relief as is just and proper.

# EXHIBIT A

 HP Financial Services

## MASTER LEASE AND FINANCING AGREEMENT

This Master Lease and Financing Agreement Number 104529 (together with Annex A and Exhibits A and B attached hereto and hereby made a part hereof, this "Master Agreement") is entered into by and between Hewlett-Packard Financial Services Company[1], a Delaware corporation ("Lessor"), and The Harman Press, a California Corporation ("Lessee"). Capitalized terms used in this Master Agreement without definition have the meanings specified in Annex A to this Master Agreement.

1. **MASTER AGREEMENT; SCHEDULES.** This Master Agreement sets forth the general terms and conditions upon which (a) Lessor shall lease to Lessee and Lessee shall lease from Lessor items of Hardware, Software or both (such Hardware and Software being collectively referred to as "Equipment") and (b) Lessor shall provide financing to Lessee for software program license fees, maintenance fees, fees for other services, and other costs and one-time charges ("Financed Items") Lessee desires to finance hereunder. If Lessor and Lessee agree to a lease of particular Equipment (a "Lease") and/or a financing of particular Financed Items (a "Financing"), each item of Equipment and/or Financed Item will be described on a schedule in the form of Exhibit A, which schedule will incorporate this Master Agreement by reference ("Schedule"). Each Schedule, when executed by Lessee and Lessor, will constitute a separate Lease and/or Financing. If specific terms of a Schedule conflict with the terms of this Master Agreement, the provisions of the Schedule will control.

2. **ACCEPTANCE; INITIAL TERM AND TERM.** (a) Acceptance. Lessee shall unconditionally and irrevocably accept all Equipment under a Lease and, if applicable, all related Financed Items subject to a Financing as soon as such Equipment is delivered and inspected by Lessee and found to be satisfactory. In the case of a Financing of Financed Items unrelated to any Equipment subject to a Lease, Lessee shall unconditionally and irrevocably accept such Financed Items as soon as it shall have become liable to pay for such Financed Items. In either case, Lessee will evidence such acceptance by executing and delivering to Lessor a properly completed Acceptance Certificate as soon as reasonably practicable. (b) Initial Term of Leases and Term of Financings. The Initial Term of each Lease and, if applicable, the Term of any related Financing stated in and evidenced by a Schedule executed pursuant to this Section 2 will begin on the Acceptance Date of the Equipment subject to that Lease and will continue for the period described in the applicable Schedule; the Term of each Financing stated in and evidenced by a Schedule executed pursuant to this Section 2 that is unrelated to any Lease will begin on the Acceptance Date for the related Financed Items and will continue for the period described in the applicable Schedule.

3. **RENT; LATE CHARGES.** As rent for the Equipment under any Lease and the Financed Items under any Financing (in either case, referred to in this Master Agreement and any Schedule as "Rent"), Lessee agrees to pay the amounts specified in the applicable Schedule on the due dates specified in the applicable Schedule. If any part of any Rent payment or other amount due under this Master Agreement is not paid within 10 days of its due date, Lessee agrees to pay Lessor: (a) in the first month, a late charge to compensate Lessor for collecting and processing the late amount, which late charge is stipulated and liquidated at the greater of $.05 per dollar of each delayed amount or $50; plus (b) a charge for every month after the first month in which the amount is late to compensate Lessor for the inability to reinvest the amount, which charge is stipulated and liquidated at 1-½% of the delayed amount per month (or the lesser rate that is the maximum rate allowable under applicable law).

4. **LEASES AND FINANCINGS NON-CANCELABLE; NET LEASES; WAIVER OF DEFENSES TO PAYMENT.** IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT EACH LEASE AND FINANCING HEREUNDER SHALL BE NON-CANCELABLE, AND THAT EACH LEASE HEREUNDER IS A NET LEASE. LESSEE AGREES THAT IT HAS AN ABSOLUTE AND UNCONDITIONAL OBLIGATION TO PAY ALL RENT AND OTHER AMOUNTS WHEN DUE. LESSEE IS NOT ENTITLED TO ABATE OR REDUCE RENT OR ANY OTHER AMOUNT DUE, OR TO SET OFF ANY CHARGE AGAINST ANY SUCH AMOUNT. LESSEE HEREBY WAIVES ANY RECOUPMENT, CROSS-CLAIM, COUNTERCLAIM OR ANY OTHER DEFENSE AT LAW OR IN EQUITY TO ANY RENT PAYMENT OR OTHER AMOUNT DUE WITH RESPECT TO ANY LEASE OR FINANCING, WHETHER ANY SUCH DEFENSE ARISES OUT OF THIS MASTER AGREEMENT, ANY SCHEDULE, ANY CLAIM BY LESSEE AGAINST LESSOR, LESSOR'S ASSIGNEES OR SUPPLIER, OR OTHERWISE.

5. **ASSIGNMENT OF PURCHASE DOCUMENTS.** Lessee assigns to Lessor all of Lessee's right, title and interest in and to (a) the Equipment described in each Schedule, and (b) the Purchase Documents relating to such Equipment. Such assignment of the Purchase Documents is an assignment of rights only; nothing in this Master Agreement shall be deemed to have relieved Lessee of any obligation or liability under any of the Purchase Documents, except that, as between Lessee and Lessor, Lessor shall pay for the Equipment within 30 days after Lessee's delivery to Lessor of a properly completed and executed Acceptance Certificate and all other documentation necessary to establish Lessee's acceptance of such Equipment under the related Lease. Lessee represents and warrants that it has reviewed and approved the Purchase Documents. In addition, if Lessor shall so request, Lessee shall deliver to Lessor a document acceptable to Lessor whereby Seller acknowledges and provides any required consent to such assignment. For the avoidance of doubt, Lessee covenants and agrees that it shall at all times during the Total Term of each Lease comply in all respects with the terms of any License Agreement relating to any Equipment leased thereunder. IT IS ALSO SPECIFICALLY UNDERSTOOD AND AGREED THAT NEITHER SUPPLIER NOR ANY SALESPERSON OF SUPPLIER IS AN AGENT OF LESSOR, NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER ANY TERMS OF THIS MASTER AGREEMENT OR ANY SCHEDULE.

6. **ASSIGNMENT OF SUPPLIER WARRANTIES.** To the extent permitted, Lessor hereby assigns to Lessee, for the Total Term of any Lease, all Equipment warranties, indemnities, and representations provided in the applicable Purchase Documents. Lessee shall have the right to take any action it deems appropriate to enforce such warranties, indemnities and representations provided such enforcement is pursued in Lessee's name and at its expense. Any recovery resulting from any such enforcement efforts will be divided between Lessor and Lessee as their interests may appear.

7. **EQUIPMENT RETURN REQUIREMENTS.** Not later than 5 days after the last day of the Total Term of each Lease (and any other time Lessee is required to return Equipment to Lessor under the terms of this Master Agreement or any Schedule), for all Equipment to be returned to Lessor, Lessee shall (a) remove any Lessee labels, tags or other identifying marks on the Equipment and wipe clean or permanently delete all data contained on the Equipment, including without limitation, any data contained on internal or external drives, discs, or accompanying media, (b) pack the Equipment in accordance with the manufacturer's guidelines, and (c) deliver such Equipment to Lessor at any destination within the continental United States designated by Lessor. In the case of any item of Software to be returned to Lessor, Lessee shall also deliver to Lessor the original certificate of authenticity issued by the licensor of such Software, if any, the end user license agreement, any CD-ROM, diskettes or other media relating to such Software and any other materials originally delivered to Lessee with such Software. All dismantling, packaging, transportation, in-transit insurance and shipping charges shall be borne by Lessee. All Equipment shall be returned to

---

[1] Authorized to do business in the name of Hewlett-Packard Financial Services Company Inc. in the States of Alabama and New York.

HPFS US MLFA11 (Rev. 9.05)

Lessor in the same condition and working order as when delivered to Lessee, reasonable wear and tear excepted, and, except in the case of PC Equipment and Software, shall qualify for maintenance service by the Supplier at its then standard rates for Equipment of that age, if available. Lessee shall be responsible for, and shall reimburse Lessor promptly on demand for, the cost of returning the Equipment to good working condition or, in the case of Equipment other than PC Equipment and Software, qualifying the Equipment for the Supplier's maintenance service, if available. The return of the Equipment shall constitute a full release by Lessee of any leasehold rights or possessory interest in the Equipment.

8. EQUIPMENT USE; MAINTENANCE AND ADDITIONS.   Lessee shall, at its own expense, at all times during the applicable Total Term (a) operate and maintain the Equipment in good working order, repair and condition, and in accordance with the manufacturer's specifications and recommendations, (b) except in the case of PC Equipment and Software, maintain and enforce a maintenance agreement to service and maintain the Equipment, upon terms and with a provider reasonably acceptable to Lessor, such that the Equipment shall qualify for Maintenance Service at the time the Equipment is returned to Lessor, and (c) make all alterations or additions to the Equipment required by any applicable law, regulation or order. Lessee shall make no alterations or additions to the Equipment, except those that will not void any warranty made by the Supplier of the Equipment, result in the creation of any security interest, lien or encumbrance on the Equipment or impair the value or use of the Equipment either at the time made or at the end of the Total Term of the applicable Lease, and that are readily removable without damage to the Equipment ("Optional Additions"). All additions to the Equipment or repairs made to the Equipment, except Optional Additions, become a part thereof and Lessor's property at the time made. Optional Additions that have not been removed prior to the return of the Equipment shall become Lessor's property upon such return. On at least 24 hours prior notice to Lessee, Lessor and Lessor's agents shall have the right, during Lessee's normal business hours, to enter the premises where the Equipment is located for the purpose of inspecting the Equipment.

9. EQUIPMENT OWNERSHIP; LIENS; LOCATION.  As between Lessor and Lessee, Lessor is the sole owner of the Equipment and has sole title thereto. Lessee covenants that it will not pledge or encumber the Equipment or Lessor's interest in the Equipment in any manner whatsoever nor create or permit to exist any levy, lien or encumbrance thereof or thereon except those created by or through Lessor. The Equipment shall remain Lessor's personal property whether or not affixed to realty and shall not become a fixture or be made to become a part of any real property on which it is placed without Lessor's prior written consent. If Lessee has been provided tags or identifying labels, Lessee will at Lessee's expense affix and maintain the same in a prominent position on each item of Equipment to indicate Lessor's ownership. Lessee may relocate any Equipment from the Equipment Location specified in the applicable Schedule to another of its business locations within the United States upon prior written notice to Lessor specifying the new Equipment Location, provided Lessee remains in possession and control of the Equipment. Lessee shall not locate or relocate any Equipment such that any third party comes into possession or control thereof without Lessor's prior written consent; provided, however, that Lessor shall not unreasonably withhold its consent to the location or relocation of Equipment to a third party co-location or hosting facility if such third party shall have executed and delivered to Lessor a waiver agreement in form and substance acceptable to Lessor pursuant to which, among other things, such third party shall have waived any rights to the Equipment and agreed to surrender the Equipment to Lessor in the event of a Lease Default under this Master Agreement.

10. RISK OF LOSS AND INSURANCE.  Lessee assumes any and all risk of loss or damage to the Equipment until such Equipment is returned to and received by Lessor in accordance with the terms and conditions of this Master Agreement. Lessee agrees to keep the Equipment insured at Lessee's expense against all risks of loss from any cause whatsoever, including without limitation, loss by fire (including extended coverage), theft and damage, and such insurance shall cover not less than the Stipulated Loss Value of the Equipment. Lessee also agrees that it shall carry commercial general liability insurance in an amount not less than $2,000,000 total liability per occurrence. Lessee shall cause Lessor and its affiliates, and its and their successors and assigns, to be named loss payees and additional insureds, as applicable, under such insurance policies. Each policy shall provide that the insurance cannot be canceled without at least 30 days prior written notice to Lessor, and no policy shall contain a deductible in excess of $25,000. Lessee shall provide to Lessor (a) on or prior to the Acceptance Date for each Lease, and from time to time thereafter, certificates of insurance evidencing such insurance coverage throughout the Total Term of each Lease, and (b) upon Lessor's request, copies of the insurance policies. If Lessee fails to provide Lessor with such evidence, then Lessor will have the right, but not the obligation, to purchase such insurance protecting Lessor at Lessee's expense. Lessee's expense shall include the full premium paid for such insurance and any customary charges, costs or fees of Lessor. Lessee agrees to pay such amounts in substantially equal installments allocated to each Rent payment (plus interest on such amounts at the rate of 1-1/2% per month or such lesser rate as is the maximum rate allowable under applicable law).

11. CASUALTY LOSS.  Lessee shall notify Lessor of any Casualty Loss or repairable damage to any Equipment not later than 30 days following the date of any such occurrence. In the event any Casualty Loss shall occur, on the next Rent payment date Lessee shall pay Lessor the Stipulated Loss Value of the Equipment suffering the Casualty Loss. Upon Lessor's receipt of such payment of Stipulated Loss Value in full: (a) Lessor shall transfer to Lessee all of Lessor's interest in the Equipment suffering the Casualty Loss "AS IS, WHERE IS," without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor, (b) the applicable Lease shall terminate as it relates to such Equipment, and (c) except as provided in Section 26(m), Lessee shall be relieved of all obligations under the applicable Lease as it relates to such Equipment. In the event of any repairable damage to any Equipment, the Lease shall continue with respect to such Equipment without any abatement of Rent and Lessee shall at its expense cause such Equipment to be repaired to the condition it is required to be maintained in pursuant to Section 8 not later than 30 days from the date of its occurrence.

12. TAXES.  Lessee shall report and pay all Taxes now or hereafter imposed or assessed by governmental body, agency or taxing authority upon the purchase, ownership, delivery, installation, leasing, rental, use or sale of the Equipment, the Rent or other charges payable hereunder, or otherwise upon or in connection with any Lease or Financing, whether assessed on Lessor or Lessee, other than any such Taxes required by law to be reported and paid by Lessee. Lessee shall within 30 days of invoice reimburse Lessor for all such Taxes paid by Lessor, together with any penalties or interest in connection therewith attributable to Lessee's acts or failure to act, excluding (a) Taxes on or measured by the overall gross or net income or items of tax preference of Lessor, (b) as to any Lease or the related Equipment, Taxes attributable to the period after the return of such Equipment to Lessor, and (c) Taxes imposed as a result of a sale or other transfer by Lessor of any portion of its interest in any Lease or Financing or in any Equipment, except for a sale or other transfer to Lessee or a sale or other transfer occurring after and during the continuance of any Lessee Default.

13. GENERAL INDEMNITY.  Lessee shall indemnify, defend and hold harmless Lessor, its employees, officers, directors, agents and assignees from and against any and all Claims arising directly or indirectly out of or in connection with any matter involving this Master Agreement, the Equipment, the Financed Items or any Lease and/or Financing.

14. TAX BENEFIT INDEMNITY.  Lessor and Lessee agree that Lessor is entitled to certain federal, state and local tax benefits available to an owner of Equipment (collectively, "Tax Benefits"), including without limitation, accelerated cost recovery system deductions for 5-year property and deductions for interest incurred by Lessor to finance the purchase of Equipment available under the Code. Lessee represents, warrants and covenants to Lessor that (a) Lessee is not a tax-exempt entity (as defined in Section 168(h) of the Code); (b) all Equipment will be used solely within the United States; and (c) Lessee will take no position inconsistent with the assumption that Lessor is the owner of the Equipment for federal, state, and local tax purposes. If, due to any act or omission of Lessee or

(Rev. 9.05)

2

any party acting through Lessee, or the breach or inaccuracy of any representation, warranty or covenant of Lessee contained in any Fundamental Agreement, Lessor reasonably determines that it cannot claim, is not allowed to claim, loses or must recapture any or all of the Tax Benefits otherwise available with respect to the Equipment subject to any Lease (a "Tax Loss"), then Lessee shall, promptly upon demand, pay to Lessor an amount sufficient to provide Lessor the same after-tax rate of return and aggregate after-tax cash flow through the end of the Then Applicable Term that Lessor would have realized but for such Tax Loss.

15. COVENANT OF QUIET ENJOYMENT. So long as no Lessee Default exists, and no event shall have occurred and be continuing which, with the giving of notice or the passage of time or both, would constitute a Lessee Default neither Lessor nor any party acting or claiming through Lessor, by assignment or otherwise, will disturb Lessee's quiet enjoyment of the Equipment during the Total Term of the related Lease.

16. DISCLAIMERS AND LESSEE WAIVERS. LESSEE LEASES THE EQUIPMENT FROM LESSOR "AS IS, WHERE IS". IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT (A) EXCEPT AS EXPRESSLY SET FORTH IN SECTION 15, LESSOR MAKES ABSOLUTELY NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY, OPERATION, OR CONDITION OF ANY EQUIPMENT OR FINANCED ITEMS (OR ANY PART THEREOF), THE MERCHANTABILITY OR FITNESS OF EQUIPMENT OR FINANCED ITEMS FOR A PARTICULAR PURPOSE, OR ISSUES REGARDING PATENT INFRINGEMENT, TITLE AND THE LIKE; (B) LESSOR SHALL NOT BE DEEMED TO HAVE MADE, BE BOUND BY OR LIABLE FOR, ANY REPRESENTATION, WARRANTY OR PROMISE MADE BY THE SUPPLIER OF ANY EQUIPMENT OR FINANCED ITEMS (EVEN IF LESSOR IS AFFILIATED WITH SUCH SUPPLIER); (C) LESSOR SHALL NOT BE LIABLE FOR ANY FAILURE OF ANY EQUIPMENT OR FINANCED ITEMS OR ANY DELAY IN THE DELIVERY OR INSTALLATION THEREOF; (D) LESSEE HAS SELECTED ALL EQUIPMENT AND FINANCED ITEMS WITHOUT LESSOR'S ASSISTANCE; AND (E) LESSOR IS NOT A MANUFACTURER OF ANY EQUIPMENT, IT IS FURTHER AGREED THAT LESSOR SHALL HAVE NO LIABILITY TO LESSEE OR ANY THIRD PARTIES FOR ANY INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS MASTER AGREEMENT OR ANY SCHEDULE OR CONCERNING ANY EQUIPMENT OR FINANCED ITEMS, OR FOR ANY DAMAGES BASED ON STRICT OR ABSOLUTE TORT LIABILITY OR LESSOR'S NEGLIGENCE; PROVIDED, HOWEVER, THAT NOTHING IN THIS MASTER AGREEMENT SHALL DEPRIVE LESSEE OF ANY RIGHTS IT MAY HAVE AGAINST ANY PERSON OTHER THAN LESSOR. LESSOR AND LESSEE AGREE THAT THE LEASES AND THE FINANCINGS SHALL BE GOVERNED BY THE EXPRESS PROVISIONS OF THIS MASTER AGREEMENT AND THE OTHER FUNDAMENTAL AGREEMENTS AND NOT BY THE CONFLICTING PROVISIONS OF ANY OTHERWISE APPLICABLE LAW. ACCORDINGLY, TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES THOSE RIGHTS AND REMEDIES AGAINST A LESSOR CONFERRED UPON A LESSEE BY ARTICLE 2A OF THE UCC AND THOSE RIGHTS NOW OR HEREAFTER CONFERRED BY STATUTE OR OTHERWISE, IN EITHER CASE THAT ARE INCONSISTENT WITH OR THAT WOULD LIMIT OR MODIFY LESSOR'S RIGHTS SET FORTH IN THIS MASTER AGREEMENT.

17. LESSEE WARRANTIES. Lessee represents, warrants and covenants to Lessor that as of the date of this Master Agreement and for so long as this Master Agreement shall remain in effect: (a) ALL EQUIPMENT WILL BE USED FOR BUSINESS PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES: (b) Lessee is duly organized, validly existing and in good standing under applicable law; (c) Lessee has the power and authority to enter into each of the Fundamental Agreements; (d) all Fundamental Agreements are enforceable against Lessee in accordance with their terms and do not violate or create a default under any instrument or agreement binding on Lessee; (e) as of the date of its execution of this Master Agreement and as of the Acceptance Date of any Equipment or Financed Items, there are no pending or threatened actions or proceedings before any court or administrative agency that could reasonably be expected to have a material adverse effect on Lessee or any Fundamental Agreement, unless such actions are disclosed to Lessor and consented to in writing by Lessor; (f) Lessee shall comply with the requirements of all applicable laws and regulations the violation of which could have an adverse effect upon the Equipment, Lessor's rights and remedies under any Fundamental Agreement or Lessee's performance of its obligations under any Fundamental Agreement; (g) each Fundamental Agreement shall be effective against all creditors of Lessee under applicable law, including fraudulent conveyance and bulk transfer laws, and shall raise no presumption of fraud; (h) all financial statements and other related information furnished by Lessee shall be prepared in accordance with generally accepted accounting principles and shall fairly present Lessee's financial position as of the dates given on such statements; (i) Lessee's name set forth in the signature block below is Lessee's full and accurate legal name: (j) Lessee is a Corporation organized under the laws of California; (k) Lessee's "location" (within the meaning of UCC Section 9-307) is 1227 North Highland Ave, Los Angeles, CA 90038; (l) Lessee's organizational number assigned to it by its jurisdiction of organization is C0453628; (m) Lessee's federal tax identification number is 95-2280466 ; (n) Lessee and all Lessee Affiliates do not export, re-export, or transfer any Equipment, Software or source code or any direct product thereof to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments; (o) Lessee and all Lessee Affiliates do not use any Equipment, Software or System Software or technology, technical data, or technical assistance related thereto or the products thereof in the design, development, or production of nuclear, missile, chemical, or biological weapons or transfer the same to a prohibited destination, or to nationals of proscribed countries wherever located, without prior authorization from the United States and other applicable governments; and (p) Lessee and all Lessee Affiliates are not entities designated by the United States government or any other applicable government with which transacting business without the prior consent of such government is prohibited. Lessee agrees to provide Lessor advance written notice of any change in any of the representations and covenants set forth in clauses (i) through (m) of this Section 17.

18. DEFAULT. Any of the following shall constitute a default by Lessee (a "Lessee Default") under this Master Agreement and all Leases and Financings: (a) Lessee fails to pay any Rent payment or any other amount payable to Lessor under this Master Agreement or any Schedule within 10 days after its due date; or (b) Lessee defaults on or breaches any of the other terms and conditions of any Material Agreement, and fails to cure such breach within 10 days after written notice thereof from Lessor; or (c) any representation or warranty made by Lessee in any Material Agreement proves to be incorrect in any material respect when made or reaffirmed; or (d) any change occurs in relation to Lessee's or Guarantor's business, management, ownership or financial condition that would have a material adverse effect on Lessee's ability to perform its obligations under this Master Agreement or any Schedule or Guarantor's ability to perform its obligations under its guaranty; or (e) Lessee or Guarantor dissolves or otherwise terminates its existence, ceases to do business or becomes insolvent or fails generally to pay its debts as they become due; or (f) any Equipment is levied against, seized or attached; or (g) Lessee or Guarantor makes an assignment for the benefit of creditors; or (h) a proceeding under any bankruptcy, reorganization, arrangement of debt, insolvency or receivership law is filed by or against Lessee or Guarantor (and, if such proceeding is involuntary, it is not dismissed within 60 days after the filing thereof) or Lessee or Guarantor takes any action to authorize any of the foregoing matters; or (i) any letter of credit or guaranty issued in support of a Lease or Financing is revoked, breached, cancelled or terminated (unless consented to in advance in writing by Lessor); or (j) any Guarantor fails to fulfill its obligations in favor of Lessor pursuant to its guaranty.

(Rev. 9.05)
3

**19. REMEDIES.** If a Lessee Default occurs, Lessor may, in its sole discretion, exercise one or more of the following remedies: (a) declare all amounts due and to become due under any or all Leases and Financings to be immediately due and payable; or (b) terminate this Master Agreement or any Lease or Financing; or (c) take possession of, or render unusable, any Equipment wherever the Equipment may be located, without demand or notice and without any court order or other process of law in accordance with Lessee's reasonable security procedures, and no such action shall constitute a termination of any Lease; or (d) require Lessee to deliver the Equipment to a location specified by Lessor; or (e) declare the Stipulated Loss Value for any or all Equipment to be due and payable as liquidated damages for loss of a bargain and not as a penalty and in lieu of any further Rent payments under the applicable Lease or Leases; or (f) proceed by court action to enforce performance by Lessee of any Lease or Financing and/or to recover all damages and expenses incurred by Lessor by reason of any Lessee Default; or (g) terminate any other agreement that Lessee may have with Lessee; or (h) exercise any other right or remedy available to Lessor at law or in equity. Also, Lessee shall pay Lessor all costs and expenses that Lessor may incur to maintain, safeguard or preserve the Equipment, and other expenses incurred by Lessor in enforcing any of the terms, conditions or provisions of this Master Agreement (including reasonable legal fees and collection agency costs). Upon repossession or surrender of any Equipment or Collateral, Lessor may lease, sell or otherwise dispose of the Equipment and/or Collateral in a commercially reasonable manner, with or without notice and at public or private sale, and apply the net proceeds thereof to the amounts owed to Lessor hereunder, but only after deducting (1) in the case of a sale, the estimated Fair Market Value of the Equipment sold as of the scheduled expiration of the Then Applicable Term of the related Lease, (2) in the case of a lease, the rent due for any period beyond the scheduled expiration of the Then Applicable Term of the related Lease, and (3) in either case, all expenses (including reasonable legal fees and costs) incurred by Lessor in connection therewith, or propose to retain any or all of the Equipment and/or Collateral in full or partial satisfaction, as the case may be, of amounts owed to Lessor hereunder; provided, however, that Lessee shall remain liable to Lessor for any deficiency that remains after any sale, lease or retention by Lessor of such Equipment. Any proceeds of any sale or lease of such Equipment in excess of the amounts owed to Lessor hereunder shall be retained by Lessor. Lessee agrees that with respect to any notice of a sale required by law to be given, 10 days' notice shall constitute reasonable notice. Upon payment of all past due Rent and the Stipulated Loss Value as provided in clause (e) above, together with interest at the rate of 1-1/2% per month (or such lesser rate as is the maximum rate allowable under applicable law) from the date declared due until paid, Lessor will transfer to Lessee all of Lessor's interest in the Equipment for which such Rent and Stipulated Loss Value has been paid, which transfer shall be on an "AS IS, WHERE IS" basis, without any warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. With respect to any exercise by Lessor of its right to recover and/or dispose of any Equipment or other Collateral securing Lessee's obligations under any Schedule, Lessee acknowledges and agrees as follows: (i) Lessor shall have no obligation, subject to the requirements of commercial reasonableness, to clean-up or otherwise prepare the Equipment or any other Collateral for disposition, (ii) Lessor may comply with any applicable state or Federal law requirements in connection with any disposition of the Equipment or other Collateral, and any actions taken in connection therewith shall not be deemed to have adversely affected the commercial reasonableness of any such disposition, and (iii) Lessor may convey the Equipment and any other Collateral on an "AS IS, WHERE IS" basis, and without limiting the generality of the foregoing, may specifically exclude or disclaim any and all warranties, including any warranty of title or the like with respect to the disposition of the Equipment or other Collateral, and no such conveyance or such exclusion or such disclaimer of any warranty shall be deemed to have adversely affected the commercial reasonableness of any such disposition. These remedies are cumulative of every other right or remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise, and may be enforced concurrently or separately from time to time.

**20. PERFORMANCE OF LESSEE'S OBLIGATIONS.** If Lessee fails to perform any of its obligations hereunder, Lessor may perform any act or make any payment that Lessor deems reasonably necessary for the preservation of Lessor's interests therein; provided, however, that the performance of any act or payment by Lessor shall not be deemed a waiver or release of Lessee from the obligation at issue. All sums so paid by Lessor, together with expenses (including legal fees and costs) incurred by Lessor in connection therewith, shall be paid to Lessor by Lessee immediately upon demand.

**21. TRUE LEASE; SECURITY INTEREST; MAXIMUM RATE.** Each Lease is intended to be a "Finance Lease" as defined in Article 2A of the UCC, and Lessee hereby authorizes Lessor to file a financing statement to give public notice of Lessor's ownership of the Equipment. The parties' intent that each Lease be a "Finance Lease" within the meaning of Article 2A of the UCC shall have no effect on the characterization of any Lease for accounting purposes, which characterization shall be made by each party independently on the basis of generally accepted accounting principles. Lessee, by its execution of each Schedule, acknowledges that Lessor has informed it that (a) the identity of Seller is set forth in the applicable Schedule, (b) Lessee is entitled under Article 2A of the UCC to the promises and warranties, including those of any third party, provided to Lessor in connection with, or as a part of, the applicable Purchase Documents, and (c) Lessee may communicate with Seller and receive an accurate and complete statement of the promises and warranties, including any disclaimers and limitations of them or of remedies. If (1) notwithstanding the express intention of Lessor and Lessee to enter into a true lease, any Lease is ever deemed by a court of competent jurisdiction to be a lease intended for security, or (2) Lessor and Lessee enter into a Lease with the intention that it be treated as a lease intended as security by so providing in the applicable Schedule, or (3) Lessor and Lessee enter into a Financing, then to secure payment and performance of Lessee's obligations under this Master Agreement and all Leases and Financings, Lessee hereby grants Lessor a purchase money security interest in the Collateral. In any such event, notwithstanding any provisions contained in this Master Agreement or in any Schedule, neither Lessor nor any Assignee shall be entitled to receive, collect or apply as interest any amount in excess of the maximum rate or amount permitted by applicable law. In the event Lessor or any Assignee ever receives, collects or applies as interest any amount in excess of the maximum amount permitted by applicable law, such excess amount shall be applied to the unpaid principal balance and any remaining excess shall be refunded to Lessee. In determining whether the interest paid or payable under any specific contingency exceeds the maximum rate or amount permitted by applicable law, Lessor and Lessee shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as an expense or fee rather than as interest, exclude voluntary prepayments and the effect thereof, and spread the total amount of interest over the entire term of this Master Agreement and all Leases and Financings.

**22. ASSIGNMENT.** Lessor shall have the unqualified right to sell, assign, grant a security interest in or otherwise convey any part of its interest in this Master Agreement, any Lease or Financing or any Equipment, in whole or in part, without prior notice to or the consent of Lessee. If any Lease or Financing is sold, assigned, or otherwise conveyed, Lessee agrees that (a) Assignee shall (1) have the same rights, powers and privileges that Lessor has under the applicable Lease or Financing, and (2) have the right to receive from Lessee all amounts due under the applicable Lease or Financing, in either case, to the extent assigned; and (b) it may not require Assignee to perform any obligations of Lessor, other than those that are expressly assumed in writing by Assignee. Lessee agrees to execute such acknowledgements thereto as may be reasonably requested by Lessor or Assignee. Lessee further agrees that in any action brought by such Assignee against Lessee to enforce Lessor's rights hereunder. Lessee will not assert against such Assignee any set-off, defense or counterclaim that Lessee may have against Lessor, Assignee, or any other person. Unless otherwise specified by Lessor and Assignee, Lessee shall continue to pay all amounts due under the applicable Lease or Financing to Lessor; provided, however, that upon notification from Lessor and Assignee, Lessee covenants to pay all amounts due under the applicable Lease or Financing to Assignee when due and as directed in such notice. Lessee further agrees that any Assignee may further sell, assign, grant a security interest in or otherwise convey its rights and interests under the applicable Lease or Financing with the same force and effect as the assignment described herein. Lessee may not assign, transfer, sell, sublease, pledge or otherwise dispose of this Master Agreement, any Lease or Financing, any Equipment or any interest therein.

(Rev. 9.05)

4

23. **TERM OF MASTER AGREEMENT.** This Master Agreement shall commence and be effective upon the execution hereof by both parties and shall continue in effect until terminated by either party by 30 days' prior written notice to the other. However, no termination of this Master Agreement pursuant to the preceding sentence shall be effective with respect to any Lease or Financing that commenced prior to such termination until the expiration or termination of such Lease or Financing and the satisfaction by Lessee of all of its obligations hereunder with respect thereto.

24. **WAIVER OF JURY TRIAL.** LESSEE AND LESSOR HEREBY EXPRESSLY WAIVE ANY RIGHT TO DEMAND A JURY TRIAL WITH RESPECT TO ANY ACTION OR PROCEEDING INSTITUTED BY LESSOR OR LESSEE IN CONNECTION WITH THIS MASTER AGREEMENT OR ANY FUNDAMENTAL AGREEMENT.

25. **NOTICES.** All notices, requests, demands, waivers and other communications required or permitted to be given under this Master Agreement or any other Fundamental Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or mailed via certified mail or a nationally recognized overnight courier service, or sent by confirmed facsimile transmission, addressed as follows (or such other address or fax number as either party shall so notify the other):

| | |
|---|---|
| If to Lessor: | If to Lessee: |
| Hewlett-Packard Financial Services Company | The Herman Press |
| 420 Mountain Avenue - P.O. Box 6 | 1222 North Highland Ave |
| Murray Hill, New Jersey 07974-0006 | Los Angeles, CA 90038 |
| Attn: Director of Operations, North America | Attn: Philip Goldner |
| Fax: (908) 898-4109 | Fax: 323-461-7000 |

26. **MISCELLANEOUS.**
(a) **Governing Law.** THIS MASTER AGREEMENT AND EACH LEASE AND FINANCING SHALL BE GOVERNED BY THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAW PROVISIONS) OF THE STATE OF NEW JERSEY.
(b) **Consent to Jurisdiction.** Lessor and Lessee consent to the jurisdiction of any local, state or Federal court located within the State of New Jersey and waive any objection relating to improper venue or forum non-conveniens to the conduct of any proceeding in any such court.
(c) **Credit Review.** Lessee consents to a credit review by Lessor for each Lease and Financing.
(d) **Further Assurances.** Lessee agrees to promptly execute and deliver to Lessor such further documents and take such further action as Lessor may require in order to more effectively carry out the intent and purpose of this Master Agreement and any Schedule. Without limiting the generality of the foregoing, Lessee agrees (a) to furnish to Lessor from time to time, its certified financial statements, officer's certificates and appropriate resolutions, opinions of counsel and such other information and documents as Lessor may reasonably request, and (b) to execute and timely deliver to Lessor any financing statements or other documents that Lessor deems necessary under applicable law to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment; provided, however, that Lessee authorizes Lessor to file any such financing statement or other document without Lessee's authentication to the extent permitted by applicable law. Lessee hereby appoints Lessor and any agent of Lessor as Lessee's attorney-in-fact, with full power of substitution, for the sole purpose of executing on behalf of Lessee such UCC financing statements as Lessor deems necessary to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment. Lessee acknowledges and agrees that such appointment is coupled with an interest and is irrevocable until the expiration or termination of all Leases and Financings and the satisfaction by Lessee of all of its obligations hereunder. It is also agreed that Lessor or Lessor's agent may file as a financing statement, any lease document (or copy thereof, where permitted by law) that Lessor deems appropriate to perfect or protect Lessor's security interest in the Collateral or to evidence Lessor's interest in the Equipment. Upon demand, Lessee will promptly reimburse Lessor for any filing or recordation fees or expenses (including legal fees and costs) incurred by Lessor in perfecting or protecting its interests in any Collateral or the Equipment.
(e) **Captions and References.** The captions contained in this Master Agreement and any Schedule are for convenience only and shall not affect the interpretation of this Master Agreement. All references in this Master Agreement to Sections, Annexes and Exhibits refer to Sections hereof, Annexes hereof and Exhibits hereto unless otherwise indicated.
(f) **Entire Agreement; Amendments.** This Master Agreement and all other Fundamental Agreements executed by both Lessor and Lessee constitute the entire agreement between Lessor and Lessee relating to the leasing of the Equipment and the financing of Financed Items, and supersede all prior agreements relating thereto, whether written or oral, and may not be amended or modified except in a writing signed by the parties hereto.
(g) **No Waiver.** Any failure of Lessor to require strict performance by Lessee, or any written waiver by Lessor of any provision hereof, shall not constitute consent or waiver of any other breach of the same or any other provision hereof.
(h) **Lessor Affiliates.** Lessee understands and agrees that Hewlett-Packard Financial Services Company or any affiliate or subsidiary thereof may, as lessor, execute Schedules under this Master Agreement, in which event the terms and conditions of the applicable Schedule and this Master Agreement, as it relates to the lessor under such Schedule, shall be binding upon and shall inure to the benefit of such entity executing such Schedule as lessor, as well as any successors or assigns of such entity.
(i) **Lessee Affiliates.** A Lessee Affiliate may enter into a Lease or Financing under and subject to the terms and conditions of this Master Agreement by executing a Schedule incorporating this Master Agreement by reference, in which case such Lessee Affiliate shall be deemed, for purposes of such Lease or Financing, to be the "Lessee" under this Master Agreement. The undersigned Lessee hereby unconditionally guarantees to Lessor the full and prompt payment, observance and performance when due of all obligations of all Lessee Affiliates (collectively, "Guaranteed Obligations") under all such Leases and Financings. The foregoing guarantee is absolute, continuing, unlimited and independent and shall not be affected, diminished or released for any reason whatsoever. The undersigned Lessee waives diligence, presentment, demand for payment, protest or notice of any Lessee Default or nonperformance by any Lessee Affiliate, all affirmative defenses, offsets and counterclaims against Lessor, any right to the benefit of any security or statute of limitations, and any requirement that Lessor proceed first against a Lessee Affiliate or any collateral security. Until the Guaranteed Obligations shall have been paid in full, Lessee shall have no right of subrogation.
(j) **Invalidity.** If any provision of this Master Agreement or any Schedule shall be prohibited by or invalid under law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Master Agreement or such Schedule.
(k) **Counterparts.** This Master Agreement may be executed in counterparts, which collectively shall constitute one document.
(l) **Lessor Reliance.** In connection with its execution of this Master Agreement, Lessee shall deliver to Lessor an officer's certificate (or partner's or member's certificate as appropriate) in form and substance acceptable to Lessor, executed by a duly authorized officer (or partner or member) of Lessee and certifying as to, among other things, Lessee's authority to enter into this Master Agreement and Leases and Financings hereunder and the authority of Lessee's officers or

(Rev. 9.05)
5

representatives specified therein to execute this Master Agreement and all other Fundamental Agreements, Lessor may act in reliance upon any instruction, instrument or signature reasonably believed by Lessor in good faith to be genuine. Lessor may assume that any employee of Lessee who executes any document or gives any written notice, request or instruction has the authority to do so.

(m) Survival. All representations, warranties and covenants made by Lessee hereunder shall survive the termination of this Master Agreement and shall remain in full force and effect. All of Lessor's rights, privileges and indemnities under this Master Agreement or any Lease or Financing, to the extent they are fairly attributable to events or conditions occurring or existing on or prior to the expiration or termination of such Lease or Financing, shall survive such expiration or termination and be enforceable by Lessor and Lessor's successors and assigns.

27. Lessee acknowledges that neither this Master Agreement nor any other Fundamental Agreement may be amended or modified except by a writing signed by Lessor and Lessee. Lessee Initials: _____ PG _____ .

IN WITNESS WHEREOF, LESSEE AND LESSOR HAVE EXECUTED THIS MASTER AGREEMENT ON THE DATES SPECIFIED BELOW.

LESSEE:
THE HARMAN PRESS
By: _____
Name: PHILLIP GOLDNER
Title: PRESIDENT
Date: 9/5/08

LESSOR:
HEWLETT-PACKARD FINANCIAL SERVICES
COMPANY[2]
By: _____
Name: Ida Ovino-Edelmann
Title: CDMO
Date: 10-17-08

---

[1] Authorized to do business in the name of Hewlett-Packard Financial Services Company Inc. in the States of Alabama and New York.

(Rev. 9.05)
6

 **HP Financial Services**

### MASTER LEASE AND FINANCING AGREEMENT ANNEX A

Capitalized terms used in the Master Lease and Financing Agreement Number 104529 by and between Hewlett-Packard Financial Services Company and The Harman Press ("Master Agreement") without definition shall have the following respective meanings, and all references to Sections, Exhibits, Schedules or Annexes in the following definitions shall refer to Sections, Exhibits, Schedules or Annexes of or to the Master Agreement.

"Acceptance Certificate" means an acceptance certificate in substantially the form of Exhibit B executed by Lessee and delivered to Lessor in accordance with Section 2 of the Master Agreement.

"Acceptance Date" means the effective date of Lessee's acceptance of the Equipment or Financed Item(s) as referenced on the Acceptance Certificate for such Equipment and/or Financed Item(s).

"Assignee" means any assignee of all or any portion of Lessor's interest in the Master Agreement, any Schedule or any Equipment, whether such assignee received the assignment of such interest from Lessor or a previous assignee of such interest.

"Casualty Loss" means, with respect to any Equipment, the condemnation, taking, loss, destruction, theft or damage beyond repair of such Equipment.

"Casualty Value" means, as to any Equipment, an amount determined as of the date of the Casualty Loss or Lessee Default in question pursuant to a "Table of Casualty Values" attached to the applicable Schedule or, if no "Table of Casualty Values" is attached to the applicable Schedule, an amount equal to the sum of (a) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 5% per annum, compounded monthly) of all Rent payments payable after such date through the scheduled date of expiration of the Then Applicable Term, plus (b) the present value as of the date of the Casualty Loss or Lessee Default in question (discounted at 5% per annum, compounded monthly, from the scheduled date of expiration of the Then Applicable Term) of an amount determined by multiplying the applicable casualty percentage specified below by the Total Cost of such Equipment. The applicable casualty percentage shall be 50% for Equipment having an Initial Term of less than 24 months; 40% for Equipment having an Initial Term of 24 months or greater, but less than 36 months; 30% for Equipment having an Initial Term of 36 months or greater, but less than 48 months; and 25% for Equipment having an Initial Term of 48 months or greater.

"Claims" means all claims, actions, suits, proceedings, costs, expenses (including, without limitation, court costs, witness fees and attorneys' fees), damages, obligations, judgments, orders, penalties, fines, injuries, liabilities and losses, including, without limitation, actions based on Lessor's strict liability in tort.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means, with respect to any Lease or Financing, all Equipment and Financed Items and any and all attachments, accessories, additions, general intangibles, substitutions, products, replacements, rentals, and any right, title or interest in any software used to operate or otherwise installed in any of the foregoing, and proceeds (including, without limitation, insurance proceeds) thereof, as well as any and all other equipment financed pursuant to this Master Agreement or any other agreement between Lessor and Lessee and all other collateral furnished by Lessee to secure Lessee's obligations under any Schedule.

"Daily Rent" means, as to any Lease or Financing, an amount equal to the per diem Rent payable under the applicable Schedule.

"End-of-Term Notice" has the meaning specified in the applicable Schedule.

"Equipment" has the meaning specified in Section 1 of the Master Agreement.

"Equipment Location" means, as to any Equipment, the address at which such Equipment is located from time to time, as originally specified in the applicable Schedule and as subsequently specified in a notice delivered to Lessor pursuant to Section 9 of the Master Agreement, if applicable.

"Fair Market Value" means the total retail price that would be paid for any specified Equipment in an arm's length transaction between an informed and willing buyer under no compulsion to buy and an informed and willing seller under no compulsion to sell. Such total price shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"Fair Rental Value" means the amount of periodic rent that would be payable for any specified Equipment in an arm's length transaction between an informed and willing lessee and an informed and willing lessor, neither under compulsion to lease. Such amount shall not be reduced by the costs of removing such Equipment from its current location or moving it to a new location.

"Final Invoice Amount" has the meaning set forth in the applicable Schedule.

"Financed Item" has the meaning specified in Section 1 of the Master Agreement.

"Financing" has the meaning specified in Section 1 of the Master Agreement.

"First Payment Date" means, as to any Lease or Financing, the date the first Rent payment with respect to the Initial Term of such Lease or the Term of such Financing (as applicable) is due, as determined pursuant to the terms of the applicable Schedule.

"Fundamental Agreements" means, collectively, the Master Agreement, each Schedule and Acceptance Certificate and all other related instruments and documents.

"Funding Date" means, with respect to any Financed Item, the date Lessor makes funds available to the Seller of such Financed Item to pay for the same or to Lessee to reimburse Lessee for its payment of the same.

"Guaranteed Obligations" has the meaning specified in Section 26(i) of the Master Agreement.

"Guarantor" means any guarantor of all or any portion of Lessee's obligations under the Master Agreement or any Lease or Financing.

"Hardware" means items of tangible equipment and other property, including but not limited to computer, telecommunications, printing, imaging, copying, scanning, projection and storage equipment, and any related peripherals, attachments, accessions, additions, substitutions, or replacements.

"Initial Term" means, as to any Lease, the initial term thereof as specified in the applicable Schedule.

"Lease" has the meaning specified in Section 1 of the Master Agreement.

"Lessee" has the meaning specified in the preamble of the Master Agreement.

"Lessee Affiliate" means any corporation which directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, Lessee.

"Lessee Default" has the meaning specified in Section 18 of the Master Agreement.

"Lessor" has the meaning specified in the preamble of the Master Agreement.

(Rev. 9.05)

7

"License Agreement" means any license agreement or other document granting a right to use Software or any technical information, confidential business information or other documentation relating to Hardware or Software, as amended, modified or supplemented by any other agreement between the licensor and Lessor.

"Maintenance Service" means the applicable Supplier's maintenance service at its then standard rates for Equipment of that age, if available.

"Master Agreement" has the meaning specified in the preamble of the Master Agreement.

"Material Agreements" means, collectively, all Fundamental Agreements, all other material agreements by and between Lessor and Lessee, and any application for credit, financial statement, or financial data required to be provided by Lessee in connection with any Lease or Financing.

"Optional Additions" has the meaning specified in Section 8 of the Master Agreement.

"PC Equipment" means, collectively, personal computers (e.g., workstations, desktops and notebooks) and related items of peripheral equipment (e.g., monitors, printers and docking stations).

"Purchase Documents" means, as to any Equipment, any purchase order, contract, bill of sale, License Agreement, invoice and/or other documents that Lessee has, at any time, approved, agreed to be bound by or entered into with any Supplier of such Equipment relating to the purchase, ownership, use or warranty of such Equipment.

"Renewal Agreement" has the meaning specified in the applicable Schedule.

"Renewal Term" has the meaning specified in the applicable Schedule.

"Rent" has the meaning specified in Section 3 of the Master Agreement.

"Schedule" has the meaning specified in Section 1 of the Master Agreement.

"Seller" means, as to any Equipment, the seller of such Equipment, and as to any Financed Item, the provider thereof, in either case as specified in the applicable Schedule.

"Software" means copies of computer software programs owned or licensed by Lessor.

"Stipulated Loss Value" means, as to any Equipment, an amount equal to the sum of (a) all Rent and other amounts due and owing with respect to such Equipment as of the date of payment of such amount, plus (b) the Casualty Value of such Equipment.

"Supplier" means (a) as to any Equipment, the Seller and the manufacturer or licensor of such Equipment collectively, or where the context requires, any of them, and (b) as to any Financed Item, the Seller thereof.

"System Software" means an item of Software that is pre-loaded on an item of Hardware purchased by Lessor for lease hereunder for which the relevant Purchase Documents specify no purchase price separate from the aggregate purchase price specified for such items of Hardware and Software.

"Tax Benefits" has the meaning specified in Section 14 of the Master Agreement.

"Tax Loss" has the meaning specified in Section 14 of the Master Agreement.

"Taxes" means all license and registration fees and all taxes, fees, levies, imposts, duties, assessments, charges and withholdings of any nature whatsoever, however designated (including, without limitation, any value added, transfer, sales, use, gross receipts, business, occupation, excise, personal property, real property, stamp or other taxes).

"Term" means, as to any Financing, the term thereof as specified in the applicable Schedule.

"Then Applicable Term" means, as to any Lease, the term of the Lease in effect at the time of determination, whether it be the Initial Term, any Renewal Term or any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to the applicable Schedule.

"Total Cost" means (a) as to any Lease, the total amount of Equipment, and related charges, if any, stated in and subject to such Schedule, and (b) as to any Financing, the total amount of the Financed Items subject to such Financing.

"Total Term" means, as to any Lease, the aggregate term of such Lease, including the Initial Term, any Renewal Term and any optional or other automatic extension of the Initial Term or any Renewal Term pursuant to the applicable Schedule.

"UCC" means the Uniform Commercial Code as enacted and in effect in any applicable jurisdiction.

"Unit of Equipment" means, as to the Equipment leased pursuant to any Schedule, (a) each individual item of PC Equipment leased pursuant to such Schedule, and (b) all Equipment taken as a whole leased pursuant to such Schedule other than PC Equipment.

# EXHIBIT B

# AMENDMENT TO MASTER LEASE AND FINANCING AGREEMENT SCHEDULE

This Amendment to Master Lease and Financing Agreement Schedule (this "*Amendment*") is made by and between **The Harman Press** ("*Lessee*"), and Hewlett-Packard Financial Services Company, a Delaware corporation ("*HPFS*").

## WITNESSETH:

Whereas Lessee and HPFS entered into that certain Master Lease and Financing Agreement Schedule No. 104529000005 (together with any Schedules, exhibits, annexes and amendments thereto collectively, the "*Lease Agreement*").

**NOW, THEREFORE**, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, it is hereby agreed as follows:

1. **Definitions**. Unless otherwise defined herein, words and expressions defined in the Lease Agreements, as amended hereby, shall bear the same meanings when used herein.

2. **Amendment to Payment Structure of the Lease Agreement.** The Lease Agreement is hereby amended as follows:

| Lease | | |
|---|---|---|
| | 9/1/2020 | |
| 1 | 9/30/2020 | 0 |
| 2 | 10/31/2020 | 3,380.16 |
| 3 | 11/30/2020 | 3,380.16 |
| 4 | 12/31/2020 | 3,380.16 |
| 5 | 1/31/2021 | 12,496.69 |
| 6 | 2/28/2021 | 12,496.69 |
| 7 | 3/31/2021 | 12,496.69 |
| 8 | 4/30/2021 | 12,496.69 |
| 9 | 5/31/2021 | 12,496.69 |
| 10 | 6/30/2021 | 12,496.69 |
| 11 | 7/31/2021 | 12,496.69 |
| 12 | 8/31/2021 | 12,496.69 |
| 13 | 9/30/2021 | 12,496.69 |
| 14 | 10/31/2021 | 12,496.69 |
| 15 | 11/30/2021 | 12,496.69 |
| 16 | 12/31/2021 | 12,496.69 |
| 17 | 1/31/2022 | 12,496.69 |
| 18 | 2/28/2022 | 12,496.69 |
| 19 | 3/31/2022 | 12,496.69 |
| 20 | 4/30/2022 | 12,496.69 |
| 21 | 5/31/2022 | 12,496.69 |
| 22 | 6/30/2022 | 12,496.69 |
| 23 | 7/31/2022 | 12,496.69 |
| 24 | 8/31/2022 | 12,496.69 |
| 25 | 9/30/2022 | 12,496.69 |
| 26 | 10/31/2022 | 12,496.69 |

| 27 | 11/30/2022 | 12,496.69 |
| 28 | 12/31/2022 | 12,496.69 |
| 29 | 1/31/2023 | 12,496.69 |
| 30 | 2/28/2023 | 12,496.69 |
| 31 | 3/31/2023 | 12,496.69 |
| 32 | 4/30/2023 | 12,496.69 |
| 33 | 5/31/2023 | 12,496.69 |
| 34 | 6/30/2023 | 12,496.69 |
| 35 | 7/31/2023 | 12,496.69 |
| 36 | 8/31/2023 | 12,496.69 |
| 37 | 9/30/2023 | 12,496.69 |
| 38 | 10/31/2023 | 12,496.69 |
| 39 | 11/30/2023 | 12,496.69 |
| 40 | 12/31/2023 | 12,496.69 |
| 41 | 1/31/2024 | 12,496.69 |
| 42 | 2/29/2024 | 12,496.69 |
| 43 | 3/31/2024 | 12,496.69 |
| 44 | 4/30/2024 | 12,496.69 |
| 45 | 5/31/2024 | 12,496.69 |
| 46 | 6/30/2024 | 12,496.69 |
| 47 | 7/31/2024 | 12,496.69 |
| 48 | 8/31/2024 | 12,496.69 |
| 49 | 9/30/2024 | 12,496.69 |
| 50 | 10/31/2024 | 12,496.69 |
| 51 | 11/30/2024 | 12,496.69 |
| 52 | 12/31/2024 | 12,496.69 |
| 53 | 1/31/2025 | 12,496.69 |
| 54 | 2/28/2025 | 12,496.69 |
| 55 | 3/31/2025 | 12,496.69 |
| 56 | 4/30/2025 | 12,496.69 |

3. **No Other Amendment.** All other terms and conditions of the Lease Agreement shall remain in full force and effect and the Lease Agreement shall be construed as if the terms of this Amendment were included therein.

**IN WITNESS WHEREOF, THE FOREGOING AMENDMENT IS HEREBY AGREED TO, ACKNOWLEDGED AND ACCEPTED BY LESSEE AND HPFS:**

THE HARMAN PRESS

By: _____

Name: PHILLIP GOLDNER

Title: PRESIDENT

10/22/20

HEWLETT-PACKARD FINANCIAL
SERVICES COMPANY

By: _____

Name: _____

Title: _____

2

COUNTERPART NO. _____ OF _____. TO THE EXTENT THAT THIS SCHEDULE CONSTITUTES CHATTEL PAPER (AS DEFINED IN THE UCC), NO SECURITY INTEREST IN THIS SCHEDULE MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OTHER THAN COUNTERPART NO. 1.

Master Agreement Number 104529
Schedule Number 104529000005

## MASTER LEASE AND FINANCING AGREEMENT SCHEDULE

HEWLETT-PACKARD FINANCIAL SERVICES COMPANY[1] ("Lessor") and The Harman Press ("Lessee") are parties to the Master Lease and Financing Agreement identified by the Master Agreement Number specified above (the "Master Agreement"). This Schedule (which shall be identified by the Schedule Number specified above) and the Master Agreement together comprise a separate Lease, a separate Financing or a separate Lease and [a separate] Financing, as the case may be, between the parties. The terms and conditions of the Master Agreement are hereby incorporated by reference into this Schedule. All capitalized terms used in this Schedule without definition have the meanings ascribed to them in the Master Agreement.

1.    **LEASE.**
A.    **Description of Items of Leased Equipment**          **Total Cost**
      See Attached Exhibit A                                $573,500.00

B.    **Initial Term:** 60 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

2.    **FINANCING.**
A.    **Description of Financed Items**                     **Total Cost**
      See Attached Exhibit A                                $38,500.00

B.    **Term:** 60 Months (plus the number of days from and including the Acceptance Date through and including the last day of the calendar month or quarter (depending on whether Rent is payable monthly or quarterly as specified in Section 3 below) in which the Acceptance Date occurs).

3.    **RENT:**
For Lease:      $10,297.94
For Financing:  $    756.52
Total Rent:     $11,054.46

RENT is payable:    ___ in advance  _X_ in arrears (check one)
                    _X_ monthly     ___ quarterly (check one)

**DAILY RENT:**
For Lease: N/A (i.e., the Rent payment specified above expressed on a per diem basis, assuming a 360 day year and 30 day months)
For Financing: N/A (based on the Financing Rate, and interest only)

For Financings, the "Financing Rate" generally equals the rate of interest that would cause the present value of the Rent payable over the Term, calculated as of the First Payment Date and assuming monthly or quarterly (as applicable) compounding, to equal the Total Cost of the Financed Items.

Lessee shall pay Lessor (a) on the first day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in advance, or (b) on the last day of each calendar month or calendar quarter (depending on whether Rent is payable monthly or quarterly as specified above) if Rent is payable in arrears, the Rent payment specified above for the length of the Initial Term in the case of a Lease and for the length of the Term in the case of a Financing. The First Payment Date shall be the first day (if Rent is payable in advance) or the last day (if Rent is payable in arrears) of the month or quarter (as applicable) immediately following the month or quarter (as applicable) in which the Acceptance Date occurs. In addition, on the First Payment Date Lessee shall also pay Lessor (a) in the case of Leases an amount equal to the Daily Rent multiplied by (i) 15 days if Rent is payable monthly or (ii) 45 days if Rent is payable quarterly, or (b) in the case of Financings an amount equal to the Daily Rent multiplied by the number of days from and including the Funding Date up to but excluding the first day of the month or quarter (as applicable) in which the First Payment Date occurs.

For Financings, all payments of Rent will be deemed to be blended payments of principal and interest (which interest will be calculated and payable at the Financing Rate), other than (a) Daily Rent, which is interest only, and (b) if Rent is payable in advance, the first periodic payment of Rent which is principal only. All payments of Rent with respect to Financings will be applied first to accrued and unpaid interest and next on account of principal, with interest on overdue amounts calculated and payable in accordance with the Master Agreement.

4.    **PRICING EXPIRATION DATE:** 4/30/2019. Lessor's obligation to purchase and lease the Equipment or fund and finance the Financed Items is subject to the Acceptance Date being on or before the Pricing Expiration Date.

5.    **EQUIPMENT LOCATION:** See Attached Exhibit A

6.    **SELLER:** See Attached Exhibit A

7.    **LESSEE'S END-OF-LEASE-TERM OPTIONS.** Lessee may choose to exercise one of the following options upon the natural expiration of the Initial Term, any Renewal Term (as defined below) and any automatic extension of the Initial Term or any Renewal Term provided, however, that Lessee must give Lessor written notice of Lessee's choice ("End-of-Term Notice") not less than ninety (90) days before the expiration of the relevant term.
      (a) **Purchase Option.** Lessee may elect to purchase any or all Units of Equipment then subject to this Lease (other than items of Software that may not be sold by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Market Value of such Units of Equipment as of the end of the Then Applicable Term, provided no Lessee Default shall have occurred and be continuing. In the event of such an election, Lessee shall pay such amount to Lessor, in immediately available funds, on or before the last day of the Then Applicable Term. If Lessee shall have so elected to purchase any of the Units of Equipment, shall have so paid the applicable purchase price and shall have fulfilled the terms and conditions of the Master Agreement, then on the last day of the Then Applicable Term (i) this Lease with respect to such Units of Equipment shall terminate and, except as provided in Section 26(m) of the Master Agreement, Lessee shall be relieved of all of its

[1] Authorized to do business in the name of HEWLETT-PACKARD FINANCIAL SERVICES COMPANY in the States of Alabama and New York.

(Rev. 6.12)

1

obligations in favor of Lessor with respect to such Units of Equipment, and (2) Lessor shall transfer all of its interest in such Units of Equipment to Lessee "AS IS, WHERE IS," without any representation, warranty, express or implied, from Lessor, other than the absence of any liens or claims by or through Lessor. In the event Lessor and Lessee are unable to agree on the Fair Market Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

(b) **Renewal Option.** Lessee may elect to renew the Lease with respect to any or all Units of Equipment then subject to this Lease (other than items of Software that may not be re-leased by Lessor under the terms of any applicable License Agreement) for an amount equal to the Fair Rental Value of such Units of Equipment as of the end of the Then Applicable Term. In the event of such an election, Lessee shall enter into a mutually agreeable renewal agreement with Lessor ("Renewal Agreement") on or before the last day of the Then Applicable Term confirming the Units of Equipment as to which the Lease is to be renewed, the period for which the Lease is to be renewed (the "Renewal Term"), and the amount of Rent and the times at which such Rent is to be payable during the Renewal Term. In the event Lessor and Lessee are unable to agree on the Fair Rental Value of any Units of Equipment, Lessor shall, at Lessee's expense, select an independent appraiser to conclusively determine such amount.

(c) Return. Lessee may elect to return any or all of the Units of Equipment then subject to this Lease in accordance with Section 7 of the Master Agreement.

(d) AUTOMATIC EXTENSION. IF LESSEE FAILS TO DELIVER TO LESSOR AN END-OF-TERM NOTICE BY THE DATE SET FORTH HEREIN, THE INITIAL TERM OR RENEWAL TERM SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT THEN SUBJECT TO THIS LEASE THROUGH THE END OF THE CALENDAR MONTH FALLING AT LEAST 90 DAYS AFTER THE DATE LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO THIS LEASE. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.

IF LESSEE SHALL HAVE DELIVERED TO LESSOR AN END-OF-TERM NOTICE WITH RESPECT TO A LEASE, BUT SHALL HAVE SUBSEQUENTLY FAILED TO COMPLY WITH ITS OBLIGATIONS ARISING FROM ITS ELECTIONS SPECIFIED THEREIN, THEN THE THEN APPLICABLE TERM OF THE LEASE SHALL, WITHOUT ANY ADDITIONAL NOTICE OR DOCUMENTATION, BE AUTOMATICALLY EXTENDED FOR SUCCESSIVE CALENDAR MONTHS WITH RESPECT TO ALL ITEMS OF EQUIPMENT AS TO WHICH LESSEE SHALL HAVE SO FAILED TO COMPLY WITH ITS OBLIGATIONS THROUGH THE END OF THE CALENDAR MONTH IN WHICH LESSEE SHALL HAVE COMPLIED WITH SUCH OBLIGATIONS. FOR EACH CALENDAR MONTH THAT THE THEN APPLICABLE TERM OF THIS LEASE IS SO EXTENDED, LESSEE SHALL PAY TO LESSOR RENT IN AN AMOUNT EQUAL TO THE MONTHLY RENT PAYMENT IN EFFECT IMMEDIATELY PRIOR TO SUCH EXTENSION (OR THE APPROPRIATE PRO RATA PORTION OF THE RENT PAYMENT THEN IN EFFECT IN THE CASE OF RENT PAYABLE OTHER THAN ON A MONTHLY BASIS), AND ALL OTHER PROVISIONS OF THE MASTER AGREEMENT AND THIS SCHEDULE SHALL CONTINUE TO APPLY.

Notwithstanding any of the provisions of this Section 7 to the contrary, if any Lessee Default shall have occurred and be continuing at any time during the last 90 days of the Then Applicable Term of this Lease, Lessor may cancel any Renewal Term or optional or other automatic extension of the Then Applicable Term immediately upon written notice to Lessee.

8.    **ADJUSTMENTS TO SCHEDULE.** Lessee acknowledges that the Total Cost of Equipment and Financed Items and the related Rent payments set forth in this Schedule may be estimates, and if the final invoice from the Seller specifies a Total Cost that is more or less than the Total Cost set forth in this Schedule, Lessee hereby authorizes Lessor to adjust the applicable Total Cost and Rent payment on this Schedule to reflect the final invoice amount (the "Final Invoice Amount"). However, if the Final Invoice Amount exceeds the estimated Total Cost by more than 5%, Lessor will notify Lessee and obtain Lessee's prior written approval of the aforementioned adjustments. If Lessee fails to so approve any such adjustments within 15 days of Lessor's request, then this Schedule shall terminate without penalty to either Lessor or Lessee and Lessee shall be solely responsible to the Supplier for all obligations arising under the applicable Purchase Documents, including, without limitation, the obligation to purchase Equipment and pay Financed Items. All references in this Schedule to Total Cost and Rent shall mean the amounts thereof specified herein, as adjusted pursuant to this Section. Lessee also acknowledges that the Equipment and Financed Items described herein may differ from the description of the Equipment and Financed Items set forth in the related Acceptance Certificate executed by Lessee. Lessee hereby authorizes Lessor to conform the description of the Equipment and Financed Items set forth herein to the description thereof in the related Acceptance Certificate executed by Lessee. All references in this Schedule to the Equipment subject to a Lease and the Financed Items subject to a Financing shall mean the Equipment and Financed Items described herein, as conformed to the related Acceptance Certificate pursuant to this Section.

9.    ADDITIONAL PROVISIONS: N/A

LESSOR AGREES TO LEASE TO LESSEE AND LESSEE AGREES TO LEASE FROM LESSOR THE EQUIPMENT DESCRIBED IN SECTION 1.A ABOVE, IF ANY, AND LESSOR AND LESSEE AGREE TO ENTER INTO A FINANCING OF THE FINANCED ITEMS DESCRIBED IN SECTION 2.A ABOVE, IF ANY. SUCH LEASE AND/OR FINANCING WILL BE GOVERNED BY THE MASTER AGREEMENT AND THIS SCHEDULE, INCLUDING THE IMPORTANT ADDITIONAL TERMS AND CONDITIONS SET FORTH ABOVE. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS SCHEDULE AND THE MASTER AGREEMENT, THE TERMS OF THIS SCHEDULE SHALL GOVERN.

LESSEE:
The Harman Press

By: _____

Name: PHILLIP GOLDNER

Title: PRESIDENT

Date: 4/8/19

LESSOR:
HEWLETT-PACKARD FINANCIAL SERVICES COMPANY[2]

By: _____
Ebony Cummings

Name: Customer Delivery Specialist

Title: _____

Date: 4/24/19

---

[2] Authorized to do business in the name of HEWLETT-PACKARD FINANCIAL SERVICES COMPANY in the States of Alabama and New York.

| 104529000005 Restructure 3 | | Dollar out |
|---|---|---|
| Lease | Date | Lease Payment |
| | 9/1/2020 | |
| 1 | 9/30/2020 | 0 |
| 2 | 10/31/2020 | 3,380.16 |
| 3 | 11/30/2020 | 3,380.16 |
| 4 | 12/31/2020 | 3,380.16 |
| 5 | 1/31/2021 | 12,496.69 |
| 6 | 2/28/2021 | 12,496.69 |
| 7 | 3/31/2021 | 12,496.69 |
| 8 | 4/30/2021 | 12,496.69 |
| 9 | 5/31/2021 | 12,496.69 |
| 10 | 6/30/2021 | 12,496.69 |
| 11 | 7/31/2021 | 12,496.69 |
| 12 | 8/31/2021 | 12,496.69 |
| 13 | 9/30/2021 | 12,496.69 |
| 14 | 10/31/2021 | 12,496.69 |
| 15 | 11/30/2021 | 12,496.69 |
| 16 | 12/31/2021 | 12,496.69 |
| 17 | 1/31/2022 | 12,496.69 |
| 18 | 2/28/2022 | 12,496.69 |
| 19 | 3/31/2022 | 12,496.69 |
| 20 | 4/30/2022 | 12,496.69 |
| 21 | 5/31/2022 | 12,496.69 |
| 22 | 6/30/2022 | 12,496.69 |
| 23 | 7/31/2022 | 12,496.69 |
| 24 | 8/31/2022 | 12,496.69 |
| 25 | 9/30/2022 | 12,496.69 |
| 26 | 10/31/2022 | 12,496.69 |
| 27 | 11/30/2022 | 12,496.69 |
| 28 | 12/31/2022 | 12,496.69 |
| 29 | 1/31/2023 | 12,496.69 |
| 30 | 2/28/2023 | 12,496.69 |
| 31 | 3/31/2023 | 12,496.69 |
| 32 | 4/30/2023 | 12,496.69 |
| 33 | 5/31/2023 | 12,496.69 |
| 34 | 6/30/2023 | 12,496.69 |
| 35 | 7/31/2023 | 12,496.69 |
| 36 | 8/31/2023 | 12,496.69 |
| 37 | 9/30/2023 | 12,496.69 |
| 38 | 10/31/2023 | 12,496.69 |
| 39 | 11/30/2023 | 12,496.69 |
| 40 | 12/31/2023 | 12,496.69 |
| 41 | 1/31/2024 | 12,496.69 |
| 42 | 2/29/2024 | 12,496.69 |
| 43 | 3/31/2024 | 12,496.69 |
| 44 | 4/30/2024 | 12,496.69 |

| 45 | 5/31/2024 | 12,496.69 |
| 46 | 6/30/2024 | 12,496.69 |
| 47 | 7/31/2024 | 12,496.69 |
| 48 | 8/31/2024 | 12,496.69 |
| 49 | 9/30/2024 | 12,496.69 |
| 50 | 10/31/2024 | 12,496.69 |
| 51 | 11/30/2024 | 12,496.69 |
| 52 | 12/31/2024 | 12,496.69 |
| 53 | 1/31/2025 | 12,496.69 |
| 54 | 2/28/2025 | 12,496.69 |
| 55 | 3/31/2025 | 12,496.69 |
| 56 | 4/30/2025 | 12,496.69 |

# EXHIBIT C

| Customer Name | Schedule Number | Serial # | Manufacture | Part Number | Equipment Description |
|---|---|---|---|---|---|
| Harman Press (The) | 104529000005.REST | | HP | 5189-1830 | 170GSN Gloss Paper |
| Harman Press (The) | 104529000005.REST | | HP | H0H72C | Smart Stream Production Pro V6 IN100 Z840 Print Server |
| Harman Press (The) | 104529000005.REST | 47100533 | HP | CA315A | Indigo 7900 Digital Printing Press, 160ppm, 2438x2438dpi |
| Harman Press (The) | 104529000005.REST | | HP | Q5391-02341 | Consumable Installation Kit |
| Harman Press (The) | 104529000005.REST | | HP | MCH-0116-51 | 1l Alcohol IPA Assembly |
| Harman Press (The) | 104529000005.REST | | HP | Q5391-02612 | Consumable Installation Kit |
| Harman Press (The) | 104529000005.REST | | HP | Q4186A | ElectroInk Calibration Cans, White, 4 Cartridges |
| Harman Press (The) | 104529000005.REST | | HP | MM-0116 | 4-Day Indigo Production Optimization Visit |
| Harman Press (The) | 104529000005.REST | | HP | H0H30B | SmartStream Designer V9.0 for Adobe Creative Cloud Site License |
| Harman Press (The) | 104529000005.REST | | HP | MCH-1652-01 | 5gal Ethylene Glycol |
| Harman Press (The) | 104529000005.REST | | HP | Q4185A | ElectroInk Cans, White, 4 Cans |

# EXHIBIT D

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER** (optional)
Corporation Service Company    1-800-858-5294

**B. E-MAIL CONTACT AT FILER** (optional)
SPRFiling@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO:** (Name and Address)

1378 88981

Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: California
(S.O.S.)

Initial Filing #: 177612552329
Initial Book #:
Initial Page #:
Initial Filing Date: 10/24/2017

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME **The Harman Press** | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS **1227 North Highland Avenue** | CITY **Los Angeles** | STATE **CA** | POSTAL CODE **90038** | COUNTRY **USA** |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME **Hewlett-Packard Financial Services Company** | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS **200 Connell Drive** | CITY **Berkeley Heights** | STATE **NJ** | POSTAL CODE **07922** | COUNTRY **USA** |

4. **COLLATERAL:** This financing statement covers the following collateral:
All equipment and software now or hereafter acquired, which Secured Party has leased to or financed for Debtor, including, but not limited to, computer, printing, imaging, copying, scanning, projection and storage equipment, any and all related peripherals, attachments, accessions, additions, general intangibles, substitutions, supplies, replacements, and any right, title or interest in any license for any software used to operate or otherwise installed in any of the foregoing, and products and proceeds of all of the foregoing (including insurance proceeds).

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

1378 88981

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**
This document was auto-generated from data received from the California Department of State

Corporation Service Company
2711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# EXHIBIT E

04/27/2022
HPFS
Harman Press (2597031569)
Contract #104529000005.REST                    **Accelerated AR Statement**

| Due Date | Inv. Control # | Invoice Type | Invoice Total | Pre-Petition | Post-Petition Past Due | Post-Petition Future Due |
|----------|----------------|--------------|---------------|--------------|------------------------|--------------------------|
|          |                |              | **$587,344.43** | **$37,490.07** | **$87,476.83** | **$462,377.53** |
| 06/30/2021 | 304267576 | Firm Rent | 12,496.69 | 12,496.69 | | |
| 07/31/2021 | 304291369 | Firm Rent | 12,496.69 | 12,496.69 | | |
| 08/31/2021 | 304313994 | Firm Rent | 12,496.69 | 12,496.69 | | |
| 09/30/2021 | 304335614 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 10/31/2021 | 304356865 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 11/30/2021 | 304379370 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 12/31/2021 | 304400917 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 01/31/2022 | 304421055 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 02/28/2022 | 304439736 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 03/31/2022 | 304462552 | Firm Rent | 12,496.69 | | 12,496.69 | |
| 04/30/2022 | 304481992 | Firm Rent | 12,496.69 | | | 12,496.69 |
| 05/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 06/30/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 07/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 08/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 09/30/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 10/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 11/30/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 12/31/2022 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 01/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 02/28/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 03/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 04/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 05/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 06/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 07/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 08/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 09/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 10/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 11/30/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 12/31/2023 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 01/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 02/29/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 03/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 04/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 05/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 06/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 07/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 08/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 09/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 10/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 11/30/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 12/31/2024 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 01/31/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 02/28/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 03/31/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |
| 04/30/2025 | | Firm Rent | 12,496.69 | | | 12,496.69 |

# EXHIBIT F

**Calzadilla, Glenys**

---

| | |
|---|---|
| **From:** | Morgan, Diane |
| **Sent:** | Tuesday, April 26, 2022 10:18 AM |
| **To:** | Sridhar, Drushya |
| **Cc:** | Calzadilla, Glenys; Hamani, Miral |
| **Subject:** | FW: HPFS - Harman Press |

Please see confirmation below.

Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000
Berkeley Heights, NJ 07922



\* \* \* \* \* NON-BINDING AND CONFIDENTIAL \* \* \* \* \*


Any offers, counteroffers or related materials contained in this e-mail transmission and any accompanying attachments do not
constitute a binding agreement until such time as a written document is executed by all necessary parties.  Further, this e-mail
transmission and any accompanying attachments may contain information from Hewlett-Packard Financial Services Company that is
CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is intended only for the use of the named recipient(s). If you
are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance
on the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should be returned to this sender
immediately. In this regard, if you have received this e-mail message in error, please notify us by reply e-mail immediately. Thank
you.

---

**From:** Fred Goldner
**Sent:** Tuesday, April 26, 2022 10:16 AM
**To:** Morgan, Diane
**Subject:** Re: HPFS - Harman Press

Yes I received this email and you can schedule to pick the Indigo


On Apr 26, 2022, at 7:10 AM, Morgan, Diane <diane.morgan@hpe.com> wrote:

Hi Fred,
Please confirm that you have received the email below, and that you have decided to return the
equipment.
Thanks again,
Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000

Berkeley Heights, NJ 07922

\<image001.png\>

\* \* \* \* \* NON-BINDING AND CONFIDENTIAL \* \* \* \* \*

Any offers, counteroffers or related materials contained in this e-mail transmission and any accompanying attachments do not constitute a binding agreement until such time as a written document is executed by all necessary parties.  Further, this e-mail transmission and any accompanying attachments may contain information from Hewlett-Packard Financial Services Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is intended only for the use of the named recipient(s). If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should be returned to this sender immediately. In this regard, if you have received this e-mail message in error, please notify us by reply e-mail immediately. Thank you.

---

**From:** Morgan, Diane
**Sent:** Tuesday, April 26, 2022 9:55 AM
**To:** Fred Goldner
**Subject:** RE: HPFS - Harman Press

Hi Fred,
Thank you for filling out the return form and sending it back to me.  Our returns group will notify you directly to schedule the de-install and pickup of the equipment.
We appreciate your cooperation in helping facilitate the return.
Diane Morgan
Collections and Recovery Specialist
HPE Financial Services
200 Connell Drive, Suite 5000
Berkeley Heights, NJ 07922

\<image001.png\>

\* \* \* \* \* NON-BINDING AND CONFIDENTIAL \* \* \* \* \*

Any offers, counteroffers or related materials contained in this e-mail transmission and any accompanying attachments do not constitute a binding agreement until such time as a written document is executed by all necessary parties.  Further, this e-mail transmission and any accompanying attachments may contain information from Hewlett-Packard Financial Services Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is intended only for the use of the named recipient(s). If you are not an intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should be returned to this sender immediately. In this regard, if you have received this e-mail message in error, please notify us by reply e-mail immediately. Thank you.

---

**From:** Fred Goldner
**Sent:** Monday, April 25, 2022 6:16 PM
**To:** Morgan, Diane
**Subject:** Re: HPFS - Harman Press

2

On Apr 25, 2022, at 3:10 PM, Morgan, Diane                               wrote:

Hi Fred,
As I haven't heard back regarding the possibility of a restructure, we need to move
forward in picking up the press, and have notified our counsel accordingly.

I'm attaching the return form which needs to be filled out and returned by tomorrow,
along with providing contact information (phone # and email address)
of the person from your company who will be responsible for working with us to
facilitate the return.

Thank you,

**Diane Morgan**
**Collections and Recovery Specialist**
HPE Financial Services
200 Connell Drive, Suite 5000
Berkeley Heights, NJ 07922


<image001.png>

* * * * * NON-BINDING AND CONFIDENTIAL * * * * *

Any offers, counteroffers or related materials contained in this e-mail transmission and any
accompanying attachments do not constitute a binding agreement until such time as a written
document is executed by all necessary parties.  Further, this e-mail transmission and any
accompanying attachments may contain information from Hewlett-Packard Financial Services
Company that is CONFIDENTIAL and may also be LEGALLY PRIVILEGED. The information is
intended only for the use of the named recipient(s). If you are not an intended recipient, you are
hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on
the contents of this e-mail information is STRICTLY PROHIBITED and that the documents should
be returned to this sender immediately. In this regard, if you have received this e-mail message
in error, please notify us by reply e-mail immediately. Thank you.

<HPFS - Return Form - Harman Press..xlsx>


Thank You,

Fred Goldner


<image002.png>

6840 Vineland Avenue
North Hollywood, CA 91605




Please stay safe.

<HPFS - Return Form - Harman Press..xlsx>

Thank You,

Fred Goldner



6840 Vineland Avenue
North Hollywood, CA 91605

Please stay safe.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067**

A true and correct copy of the foregoing document entitled (*specify*): ***NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362 (with supporting declarations) (PERSONAL PROPERTY)*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **April 29, 2022**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **April 29, 2022**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**By Overnight Delivery**
Honorable Maureen A. Tighe
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 324
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 29, 2022 | Myra Kulick | /s/ *Myra Kulick* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                              **F 9013-3.1.PROOF.SERVICE**

DOCS_LA:343075.1 35882/003

**SERVICE INFORMATION FOR CASE NO. 1:21-bk-11544-MT**

1.  <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>

- *Katherine Bunker     kate.bunker@usdoj.gov*
- *Kerry K Fennelly     kfennelly@kraw.com, fileclerk@donaldsonandcornwell.com;jschaffer@kraw.com;vmindirgasova@kraw.com;jbaldwin@kraw.com*
- *John-Patrick McGinnis Fritz (TR)     jpftrustee@lnbyg.com, jpf@trustesolutions.net*
- *Alan Craig Hochheiser     ahochheiser@mauricewutscher.com, arodriguez@mauricewutscher.com*
- *Raffi Khatchadourian     raffi@hemar-rousso.com*
- *Randall P Mroczynski     randym@cookseylaw.com*
- *Robert M Saunders     rsaunders@pszjlaw.com, rsaunders@pszjlaw.com*
- *Valerie Smith     claims@recoverycorp.com*
- *United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov*
- *Thomas B Ure     tbuesq@aol.com, urelawfirm@jubileebk.net;tom@ecf.courtdrive.com*
- *Philip A Zampiello     philipz@mkzlaw.com, PatrickM@mkzlaw.com;MichaelK@mkzlaw.com;VanessaB@mkzlaw.com*

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                              **F 9013-3.1.PROOF.SERVICE**
DOCS_LA:343075.1 35882/003